A09A1385. BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA v. AMBATI.
(685 SE2d 719)

MIKELL, Judge.

Balamurali Ambati, M.D., Ph.D., formerly an assistant professor of ophthalmology at the Medical College of Georgia ("MCG"), sued the Board of Regents of the University System of Georgia d/b/a MCG (collectively, the "BOR") for breach of his employment contract. The suit was based on MCG's violation of its Rules and Procedures for Responding to Allegations of Research Misconduct (the "Rules"). Ambati sought injunctive relief, compensatory damages, and attorney fees pursuant to OCGA § 13-6-11. Following trial, the jury returned a general verdict for $650,000. The BOR appeals from the judgment entered on the verdict, asserting that the trial court erred by denying its motion for directed verdict concerning the interpre-

---

tation of the contract, by admitting certain evidence on the claim of attorney fees, by striking the testimony of a character witness, and by entering certain discovery orders, including monetary sanctions. Finally, the BOR contends that the evidence is insufficient to sustain an award for lost earnings. Finding no error, we affirm.

Viewed most favorably in support of the verdict,[1] the evidence adduced at trial shows that Ambati was hired by MCG in 2002 as an assistant professor of ophthalmology and as the director of Cornea Service.[2] Ambati signed annual employment contracts with MCG through 2007. The last contract was accepted on July 2, 2007, and it covered the period from July 1, 2007, to June 30, 2008. In the interim, on May 23, 2007, Ambati signed a letter agreement with Case Western Reserve University to begin employment there on September 1, 2007; however, he notified the school on July 6 that he declined the offer. Subsequently, on July 9, the University of Illinois at Chicago ("UIC") offered Ambati a full-time tenure track position as professor of ophthalmology, effective September 10. Ambati announced his resignation at MCG on July 9, with an effective date of September 9, 2007. He then accepted UIC's offer.

Ambati joined the Ph.D. program at MCG in 2003. As part of his Ph.D. dissertation, Ambati was the lead author on an article that was published in the British Journal of Ophthalmology (the "Journal"), first in its on-line edition in December 2006 and then in the print edition in April 2007. Ambati gave the dissertation committee a draft of the article in February 2007 and defended his dissertation in May. The committee accepted the dissertation. Subsequently, Sally Atherton, Ph.D., who served on the committee, developed certain concerns about the article. Atherton reviewed her concerns with Ruth B. Caldwell, Ph.D., who chaired the committee and co-authored the article. On August 9, Atherton and Caldwell submitted a letter to Douglas Miller, M.D., dean of the School of Medicine, outlining their concerns.

Miller interpreted the letter as alleging research misconduct, which triggered the application of the Rules. The Rules establish a three-step procedure for responding to a written complaint of research misconduct. First, the dean conducts a preliminary assessment to determine if there is sufficient evidence to warrant the appointment of a committee to conduct an inquiry. If so, there is a

---

[1] See *ISS Intl. Svc. Systems v. Widmer*, 264 Ga. App. 55, 60 (2) (589 SE2d 820) (2003) ("our sole mission on appellate review is to determine whether any evidence supports the jury's verdict").

[2] Ambati's field of research is corneal blood vessel formation, and he has published numerous articles in scientific journals on this subject, including one that was hailed as a "breakthrough."

formal inquiry, which requires interviews with the complainant and the respondent and permits the parties to provide documentation and witnesses. The committee must issue a report summarizing the evidence and rendering findings of fact and recommendations. The inquiry must be completed within 60 days of the written complaint. In the third step, the dean determines whether or not a full investigation is warranted, based on the information learned during the inquiry.

The Rules contain "Procedural Guarantees," including one of confidentiality. This guarantee states that the investigation of any charges of research misconduct is deemed confidential, and MCG employees who learn of such an allegation "will protect, to the maximum extent possible, the confidentiality of information regarding the . . . respondent." The Rules additionally provide that "[i]f the alleged misconduct is not substantiated by a thorough investigation, formal efforts should be undertaken to restore fully the reputation of the respondent."

Miller conducted a preliminary assessment and decided to convene an inquiry. However, the two faculty members he appointed simply performed another "preliminary assessment" in which they determined that sufficient factual evidence existed to warrant an inquiry. Miller failed to notice that the faculty members had not conducted an inquiry, and he admitted that the letter he received from the faculty members on August 20 did not comply with the requirements for an inquiry report under the Rules.

Ambati first learned of the existence of an inquiry on August 21, when he met with Miller to convey his regards before leaving MCG for UIC. Although Caldwell had called Ambati into her office on August 15 to alert him to the errors in the article, she did not inform him that she and Atherton had sent a letter to Miller on August 9.[3] In any event, Miller informed Ambati that an inquiry was in progress with regard to alleged research misconduct in preparing the article. Later in the day on August 21, Ambati received a letter from Miller stating that a formal investigation had been recommended.

Ambati then went to discuss the matter with his supervisor, Julian J. Nussbaum, M.D., the Chairman of the Department of Ophthalmology. Miller had already informed Nussbaum of the allegations, and Nussbaum told Ambati that he intended to contact Ambati's future employer, Dimitri T. Azar, M.D., chair of Ophthalmologic Research at UIC. Ambati wanted Azar to hear about the matter from him, and both Nussbaum and Ambati contacted Azar. Nussbaum informed Azar that a "formal investigation into scientific

---

[3] Once alerted to the errors in the article, Ambati published an erratum in the Journal.

misconduct had been initiated by MCG." According to Ambati, Nussbaum also informed Azar that the allegations were "very serious" and that Ambati's Ph.D. had been "suspended."

On August 27, MCG realized that it had not followed the Rules and that it needed to re-form the inquiry committee. Although MCG's vice president of Legal Affairs, Andrew Newton, testified that MCG "corrected" the problem, no one at MCG notified Azar to correct the misstatement concerning the "investigation." Azar subsequently notified Ambati that his start date would be delayed until the situation was resolved. Ultimately, UIC downgraded its offer to an associate professorship and a reduced salary. Ambati declined the new offer and, instead, accepted a position with the University of Utah, beginning on January 1, 2008.

In the interim, on September 7, 2007, Ambati filed a complaint for injunctive relief against the BOR, seeking to re-form the inquiry committee. The trial court issued an interlocutory injunction on September 19, ordering MCG to convene a new inquiry committee and otherwise to comply with the Rules. The committee made no finding of scientific misconduct and concluded that the evidence did not warrant a full investigation. On November 27, 2007, the trial court issued another interlocutory injunction, ordering MCG to send a letter reflecting the committee's findings to all persons who received confidential information in violation of the Rules.

1. The BOR contends that the trial court erred in denying its motion for a directed verdict on the issue of whether Ambati's employment contract incorporated the Rules. The BOR argues that the contract was ineffective to incorporate the Rules. We disagree.

Ambati executed a form contract prepared by the BOR for BOR nontenure track personnel holding joint employment with the Veterans' Affairs Medical Center-Augusta and MCG. The contract pertinently states: "This agreement *is made expressly subject to* the applicable state and federal laws and to *the statutes and regulations of this institution* and to the bylaws and policies of the Board of Regents."[4] This same contractual language was at issue in *Walker v. Bd. of Regents &c.,*[5] and *Homer v. Bd. of Regents &c.*[6] Both cases involved breach of contract actions based on violations of the BOR's policy manual, which we deemed incorporated into the plaintiffs' employment contracts.[7] In the case at bar, the Rules were issued by MCG and were thus "regulations of this institution" within the

---

[4] (Emphasis supplied.)

[5] 254 Ga. App. 15 (561 SE2d 178) (2002).

[6] 272 Ga. App. 683 (613 SE2d 205) (2005).

[7] Id. at 685-686; *Walker*, supra at 16-17 (1).

meaning of Ambati's contract. As the contract clearly incorporates the rules by reference thereto, the trial court did not err in denying the BOR's motion for a directed verdict on this issue.

2. The BOR next contends that the trial court erroneously admitted evidence that permitted the jury to award attorney fees for conduct that transpired after suit was filed. Again, we disagree.

OCGA § 13-6-11 permits the recovery of litigation expenses "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." The circumstances which will support such an award must "relate to the conduct arising from the transaction underlying the cause of action being litigated, not conduct during the course of the litigation itself."[8] In the case at bar, the "transaction underlying the cause of action" was MCG's violation of its own Rules. The court properly charged the jury that, in order to award attorney fees, it had to find that one of the three requirements in the statute had been met. On the question of bad faith, the court instructed the jury that "the bad faith . . . must have occurred during the transaction out of which the cause of action arose." And "[q]ualified jurors under oath are presumed to follow the trial court's instructions."[9] The BOR raised no objection to this charge. It is axiomatic that one cannot complain of an alleged error that his own conduct procured or aided in causing.[10] In addition, we note that, even after suit was filed, there was evidence that MCG continued to violate its Rules by failing to protect the confidentiality of information learned during the investigation and by failing timely to take formal efforts fully to restore Ambati's reputation.

Furthermore, the admission of evidence is within the trial court's sound discretion, which will not be disturbed on appeal absent abuse.[11] The specific evidence about which the BOR complains, which was the subject of a motion in limine, either was relevant to MCG's ongoing violation of its Rules, or the BOR opened the door to it.[12] As such, the trial court did not abuse its discretion in allowing it. Finally, with regard to the BOR's hearsay objection to Ambati's testimony concerning statements made to him by Azar, the trial court ruled the testimony admissible to explain Ambati's

---

[8] (Citations omitted.) *David G. Brown, P.E., Inc. v. Kent*, 274 Ga. 849, 850 (561 SE2d 89) (2002) (statute does not permit recovery of appellate litigation expenses).

[9] (Citations and punctuation omitted.) *Mobley v. Wright*, 253 Ga. App. 335, 336 (2) (559 SE2d 78) (2002).

[10] *Dameron v. State*, 267 Ga. App. 671, 672 (2) (601 SE2d 137) (2004).

[11] *McEntyre v. McRae*, 240 Ga. App. 148 (1) (522 SE2d 731) (1999).

[12] See, e.g., *Izzo v. State*, 265 Ga. App. 143, 144 (2) (592 SE2d 915) (2004) (no abuse of discretion in admitting testimony to which appellant "opened the door").

conduct in rejecting UIC's downgraded offer of employment. The trial court also gave a limiting instruction to that effect. The BOR did not except to the limiting instruction or request any further relief. Generally, this Court "will not grant more appellate relief than that actually prayed for at trial."[13]

3. The BOR next asserts that the trial court erred in striking the testimony of a character witness, who stated that he "would be skeptical of the opinion that [Ambati] gave under oath." The BOR's brief, however, omits critical portions of the record in this regard. The record shows that one of Ambati's colleagues testified that he was aware of Ambati's reputation for truthfulness in the scientific and medical community. When the colleague was asked what that reputation was, he replied, "It is one that I think must be taken with a certain amount of skepticism." Ambati's counsel objected and moved to strike the answer as not within the purview of OCGA § 24-9-84. Thereafter, the BOR's counsel asked the witness as follows:

Q. What is his reputation for being truthful or untruthful?
A. He has a reputation for being untruthful.
Q. All right. Based upon his reputation for being untruthful, would you believe his testimony under oath?
A. I would be skeptical of the opinion that he gave under oath.

Ambati's counsel again objected and moved to strike the answer. The trial court then asked the witness, "Would you believe him under oath? Is that yes or no or you don't know?" The witness replied, "I don't know." The court initially struck the witness's testimony, but reversed itself after the BOR's counsel argued that the witness's "testimony did stand about truthfulness or untruthfulness, the part about believing him under oath." Specifically, the court ruled, "Let it stand." The BOR's counsel thanked the court and made no further argument or motion.

The procedure for impeaching a witness by proof of bad character for truthfulness is set out in OCGA § 24-9-84. "The impeaching witness should first be questioned as to his knowledge of the general character of the witness, next as to what that character is, and lastly he may be asked if from that character he would believe him on his oath."[14] Here, the court did not abuse its discretion in determining that the witness's testimony that he did not know whether he would believe Ambati under oath did not meet the requirements of the

---

[13] (Citations and punctuation omitted.) *Smith v. State*, 210 Ga. App. 451 (2) (436 SE2d 562) (1993).

[14] *Callahan v. State*, 256 Ga. App. 482, 486 (3) (a) (568 SE2d 780) (2002).

statute. In any event, the BOR's counsel acquiesced in the court's final ruling on the matter.

> A litigant cannot submit to a ruling, acquiesce in the ruling, and still complain of same. He is required to stand his ground and fight in order to successfully enumerate as error an alleged erroneous ruling by the trial judge. Acquiescence completely deprives him of the right to complain further; he has agreed that the trial court's ruling was correct by submitting to it.[15]

4. In its fourth and fifth enumerations of error, the BOR challenges three orders issued concerning discovery, including the grant of two protective orders to Ambati, one of which assessed attorney fees, and the denial of the BOR's motion to compel discovery of his tax returns. We discern no error warranting reversal. At the outset, we observe that a trial court is granted broad discretion under the discovery provisions of the Civil Practice Act, and an appellate court will not interfere with the court's exercise of its discretion absent clear abuse.[16]

(a) First, the BOR argues that the trial court erred in granting Ambati's motion for a protective order precluding the BOR from issuing subpoenas to every institution where Ambati had been enrolled, had served a residency or fellowship, or had been employed. The BOR intended to serve requests for production of documents on these institutions, seeking records of "any disciplinary action" or "allegation made" against Ambati related to any "research misconduct or dishonesty." Ambati moved for a protective order and for attorney fees on the grounds that the discovery requests were "deliberately harassing and abusive," in that they were intended to damage his reputation further. At the hearing held on the motion, the BOR argued that the information it sought was relevant to causation and damages; i.e., whether UIC may have downgraded its offer to Ambati for reasons other than Nussbaum's telephone call to Azar. The trial court construed the discovery request as "broadcasting to the academic world all over the United States" that Ambati was "having some professional problem." The court also deemed the information requested irrelevant to Ambati's breach of contract claim.

---

[15] (Citation and punctuation omitted.) *Fletcher v. Ellenburg*, 279 Ga. 52, 56 (2) (609 SE2d 337) (2005).

[16] See *Mixon v. City of Warner Robins*, 214 Ga. App. 519 (2) (448 SE2d 377) (1994). Accord *Alexander Properties Group v. Doe*, 280 Ga. 306, 307 (1) (626 SE2d 497) (2006) (protective order).

The court's protective order did not completely foreclose discovery on this issue, however. The court ruled that no subpoena could be served upon the affected institutions "until further order of this Court which this Court will reconsider should the Defendant be able to show the relevance of such discovery." The order expressly permitted the BOR to engage in further discovery with UIC.

OCGA § 9-11-26 (c) authorizes the trial court in which an action is pending, "[u]pon motion . . . and for good cause shown, . . . [to] make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." "The issuance of a protective order is a recognition of the fact that in some circumstances the interest in gathering information must yield to the interest in protecting a party"[17] from, e.g., embarrassment. Considering the overbreadth of the BOR's requests and the innuendo contained therein, the trial court did not clearly abuse its discretion in entering the protective order. The BOR contends that the information was discoverable under OCGA § 9-11-26 (b) (1), which permits parties to obtain discovery regarding any relevant matter which is not privileged, so long as the information "appears reasonably calculated to lead to the discovery of admissible evidence." But here, the trial court offered to revisit the issue, and the protective order at issue left the door open if the BOR could show that any other information had impacted UIC's decision concerning its employment offer. The BOR, however, chose not to pursue the issue further. The trial court did not abuse its broad discretion in crafting this order.

The BOR asserts that the trial court abused its discretion in awarding Ambati attorney fees as prayed for in his motion for protective order. An award of fees is authorized by statute[18] and will not be disturbed absent abuse of the court's sound discretion,[19] which was not demonstrated here. Finally, the BOR contends that Ambati's failure to conduct the conference or file the certificate required by Uniform Superior Court Rule 6.4 (B)[20] prior to filing the motion for

---

[17] (Citation and punctuation omitted.) *Borenstein v. Blumenfeld*, 151 Ga. App. 420, 421 (1) (260 SE2d 377) (1979).

[18] See OCGA § 9-11-37 (a) (4) (A):
If the motion is granted, the court shall . . . require the party . . . whose conduct necessitated the motion . . . to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.
This Code section applies to the grant of protective orders. See OCGA § 9-11-26 (c).

[19] See *Haggard v. Bd. of Regents &c.*, 257 Ga. 524, 527 (4) (c) (360 SE2d 566) (1987) (award of fees under OCGA § 9-15-14 (b) for discovery abuses will not be disturbed absent abuse of trial court's discretion).

[20] USCR 6.4 (B) provides as follows:
Prior to filing any motion seeking resolution of a discovery dispute, counsel for the

protective order warrants reversal of the trial court's order. Under the circumstances presented in this case, we find no clear abuse of discretion.[21] When the BOR's counsel raised this issue at the hearing, Ambati's counsel explained to the trial court that it was impossible to confer with opposing counsel prior to moving for a protective order to stop the innuendo that would have resulted from service of the third-party production requests. The trial court recessed the hearing and ordered counsel to consult with each other. The order reflects that the parties conferred on the motion prior to the hearing but were unable to reach a resolution. The court found that the discovery dispute could not be resolved amicably because, although the BOR withdrew the requests for production of documents after Ambati objected, the BOR sent letters to the institutions to the effect that it intended to issue them subpoenas. Under these circumstances, the USCR violation does not warrant reversal of the trial court's order.

(b) The BOR argues that the trial court abused its discretion in denying the BOR's motion to compel discovery of Ambati's income tax returns for the years 2006 through, presumably, 2007. As noted above, "[a] trial court's decision on a discovery matter will not be disturbed unless a clear abuse of discretion is shown. Also, to prevail on appeal, the [BOR] must show that the alleged error was harmful."[22] At the hearing on the motion, Ambati's counsel represented to the court that he had disclosed the relevant information in pay stubs and 1099 forms. BOR's counsel did not deny the representation and has not addressed it on appeal. "Income tax returns are not automatically discoverable upon a de minimis showing of relevancy."[23] As the information sought was provided by other means, the BOR has demonstrated neither error nor harm in the trial court's refusal to compel discovery of Ambati's income tax returns.[24]

(c) The BOR contends that the trial court abused its discretion in granting Ambati's motion for a protective order to bar a video conference deposition of a physician in California on the eve of trial.

---

moving party shall confer with counsel for the opposing party in a good faith effort to resolve the matters involved. At the time of filing the motion, counsel shall also file a statement certifying that such conference has occurred and that the effort to resolve by agreement the issues raised failed.

[21] See generally *Potter v. Wal Computers*, 220 Ga. App. 437, 438 (1) (469 SE2d 691) (1996) (not every violation of the USCR constitutes reversible error; substantial compliance is acceptable under certain circumstances).

[22] (Citations and punctuation omitted.) *Brown v. Brewer*, 237 Ga. App. 145, 148 (3) (513 SE2d 10) (1999).

[23] (Citations and punctuation omitted.) *McKinnon v. Smock*, 209 Ga. App. 647, 648 (3) (434 SE2d 92) (1993) (holding that the trial court did not abuse its discretion in requiring plaintiff to produce his income tax returns as relevant to his lost wages), citing *Borenstein*, supra.

[24] See *Borenstein*, supra.

In granting the motion, the trial court noted that although the BOR had known about the physician for months, it had waited until late on Wednesday to notice him for a deposition at 7:00 on Friday evening, immediately preceding the Monday morning trial. The BOR offered no excuse for the late hour, but claimed that Ambati and the physician were personal friends and that Ambati had relayed what happened to him at MCG.

Pursuant to OCGA § 9-11-30 (b) (4), "a deposition may be taken by telephone or other remote electronic means only upon the stipulation of the parties or by order of the court." The BOR did not seek a court order and Ambati did not stipulate to the taking of the deposition. Nor has the BOR demonstrated any harm as a result of the court's action. Accordingly, this enumerated error fails.

5. In its final enumeration of error, the BOR argues that "the trial court erred in allowing the jury to award damages for lost earnings beyond the term of the contract that was allegedly breached."

The BOR complains that the award of "lost earnings" was "speculative." We note that the BOR incorrectly states that the trial court instructed the jury that it could award "damages for lost earnings" in addition to attorney fees. As prayed for in the complaint, the trial court charged the jury on compensatory damages, i.e., damages recoverable for breach of contract.[25] In breach of contract cases, "[t]he burden is on the plaintiff to show both the breach and the damage, and this must be done by evidence which will furnish the jury data sufficient to enable them to estimate with reasonable certainty the amount of damages. It cannot be left to speculation, conjecture and guesswork."[26] An expert witness testified that the range of lost compensation between the UIC contract and Ambati's current contract at the University of Utah was between $953,286 and $1,916,221, although he admitted that he had previously reported figures of between $459,717 and $1,074,899. These amounts were calculated over Ambati's expected working life, and the BOR objected that any amounts projected beyond the term of the UIC contract were speculative. The objection was overruled.[27]

Relying on *Morehouse College v. McGaha*,[28] the BOR asserts that the trial court erred. That case is distinguishable. In *McGaha*, we held that the proper measure of future lost wages as damages for a

---

[25] See OCGA § 13-6-2.

[26] (Punctuation and footnote omitted.) *Widmer*, supra at 63 (5).

[27] At trial, the BOR moved for a directed verdict as to "any damages that exceed five years." The trial court denied the motion, and the BOR has not enumerated this ruling as error.

[28] 277 Ga. App. 529 (627 SE2d 39) (2005).

student's wrongful expulsion from school was his lost income for the additional time necessary to complete his degree and that expert testimony concerning lost income beyond that time should have been excluded.[29] The student's expert had testified that if the student returned to school, his lost income, additional tuition, and attorney fees would be $103,377, but that the value of his lost income if he did not finish college, which was likely, was $524,000. The jury awarded him $698,500.[30] We reversed the judgment on the ground that the verdict so greatly exceeded the student's possible damages that it could only reflect a "gross mistake."[31] We also pointed out that the student would have to mitigate his damages.

In this case, Ambati mitigated his damages by securing employment at Utah. And even discounting the testimony of Ambati's expert, a comparison of the Utah contract and the UIC contract enabled the jury to estimate his lost compensation with reasonable certainty. We note that UIC's offer of a full-time, tenure track professorship included, in addition to $780,000 in salary and incentives for the first three years, "$900,000 support for research over a five-year period." Ambati is an associate professor at Utah earning $205,000 per year, and his status for the first three years is probationary. The UIC contract would have been effective on September 10, 2007, whereas the Utah contract started on January 2, 2008, so that Ambati lost $83,000 in salary during that time. In addition, Ambati testified that he lost a $20,000 fellowship, pension benefits, and earnest money on a condominium in Chicago. Thus, in only the first three years of the two contracts, the evidence supports a finding that Ambati lost $165,000 in salary and incentives alone ($780,000 less $615,000), plus $83,000 in salary for the time he was unemployed, plus a $20,000 fellowship, and research funding (not to exceed $175,000 annually in the first three years of the UIC contract). Finally, the BOR admits in its brief that Ambati's counsel testified to a "grand total" of $292,862 in attorney fees and litigation expenses. The verdict of $650,000 is not excessive, unlike the verdict in *McGaha*, and the damages awarded are not speculative.

*Judgment affirmed. Johnson, P. J., and Ellington, J., concur.*

DECIDED AUGUST 21, 2009 ▮

*Thurbert E. Baker, Attorney General, Julia Anderson, Assistant*

---

[29] Id. at 532-533 (1).
[30] Id. at 531.
[31] Id. at 534-535 (2).

*Attorney General, Hollberg & Weaver, George M. Weaver,* for appellant.

*Chilivis, Cochran, Larkins & Bever, Anthony L. Cochran,* for appellee.