**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and RICKMAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 17, 2016**

# In the Court of Appeals of Georgia

A16A0996. WILSON et al. v. CLARK ATLANTA UNIVERSITY, INC.

A16A0997. CLARK ATLANTA UNIVERSITY, INC. v. WILSON, et al.

BOGGS, Judge.

This case relates to a decision by Clark Atlanta University, Inc. ("the university") to declare an enrollment emergency before laying off 54 faculty members, including those with tenure. Five of the laid off professors filed the complaint at issue here against the university.[1] Following a jury trial, the professors were awarded damages for breach of contract and bad faith damages under OCGA §

---

[1] We note that another case filed by a sixth professor is currently pending before this court following a jury verdict in favor of that professor, but it is assigned to a different term of court. See *Clark Atlanta University v. Cook*, Case No. A16A2090.

13-6-11.[2] In Case No. A16A0996, the professors assert that the trial court erred by limiting their award of contract damages to the severance pay amounts they would have received if the university had declared a "financial exigency" rather than an "enrollment emergency." In Case No. A16A0997, the university contends that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict ("JNOV") on the professors' breach of contract claims and bad faith damages under OCGA § 13-6-11, as well as awarding the cost of medical insurance and prejudgment interest to the plaintiffs.[3] For the reasons explained below, we affirm in part, vacate in part, and remand these cases for a new trial on the issue of damages for breach of contract and attorney fees under OCGA § 13-6-11.

---

[2] One of these professors, Dr. Nealy, was also awarded damages for negligence in connection with the university's loss of her personal property following her termination. The jury found in favor of the university on Dr. Nealy's conversion claim. The university's liability for negligence is not at issue in these appeals. Likewise, the issue of bad faith damages awarded in connection with Dr. Nealy's negligence claim is not before us because the trial court granted the university's judgment notwithstanding the verdict ("JNOV") motion on that claim, and Dr. Nealy has not appealed that ruling.

[3] We note that the university also asserts that the trial court erred "in denying complete summary judgment," but it is well-established that "[a]fter verdict and judgment, it is too late to review a judgment denying a summary judgment, for that judgment becomes moot when the court reviews the evidence upon the trial of the case." (Citation and punctuation omitted.) *Kicklighter v. Woodward*, 267 Ga. 157, 162 (4) (476 SE2d 248) (1996).

*Contract Between the Parties*

The evidence presented at trial shows that the university employed each professor pursuant to a nine-month contract for the 2008-2009 academic year. With regard to four of the professors, each contract stated, "I am pleased to confirm your rank as **tenured** Assistant Professor . . . for the 2008-09 academic year." (Emphasis in original.) The fifth professor's contract stated, "I am pleased to offer you a **tenure-track** appointment as Assistant Professor . . . for the 2008-2009 academic year." (Emphasis in original.) While none of the contracts defined the term "tenured" or "tenure-track," each contract stated: "As a member of the faculty, you are subject to and shall abide by the provisions of The Clark Atlanta University Faculty Handbook and any approved revisions thereof, departmental, school and University policies, and the By-Laws of the Board of Trustees."

*Faculty Handbook*

The 152-page faculty handbook states in its introduction that it "is a document composed of University polices, practices, and procedures that are most directly related to faculty members' carrying out their responsibilities. It is intended to serve as a general guideline or statement of operating principles for conduct by faculty

members of the University and by the University as a whole." Section 2.0 of the handbook provides:

> This part contains the approved policies and procedures of the university. The administration and faculty shall be subject to and will abide by the policies, practices and procedures outlined in the Faculty Handbook. The Handbook, however, shall not be construed as a legally binding contract. Where the terms and provisions of an individual contract of a faculty member are inconsistent with the general policies contained herein, the provisions of the individual contract shall govern.

According to the handbook, a tenured professor is entitled to annual contract renewal unless certain conditions occur. The handbook provides, in part:

**2.2.3 Continuous/Tenure Contracts**

Continuous contract rights at Clark Atlanta University are given to ranked faculty members who have attained tenured status as provided for in Section 2.7 of this Handbook. Faculty members employed under continuous contract are entitled to the terms and conditions of employment that exist at the time of each annual renewal by Clark Atlanta University unless separated pursuant to the terms of Section 2.8 of this Handbook.

**2.7.1 Definition of Probationary and Tenured Status**

. . .

4

Conferral of tenure means that a faculty member with the rank of Associate Professor or higher is entitled to annual contract renewal by Clark Atlanta University until retirement or resignation as defined in Sections 2.8.1 and 2.8.2 unless there is proof of adequate cause (see Section 2.8.6, Dismissal for Cause), prolonged mental or physical illness (see Section 2.8.4), financial or enrollment emergency (as defined in Sections 2.8.5.2 and 2.8.5.3) or changes in the educational program (as defined in Section 2.8.5.1).

## 2.8    Separation

At times Clark Atlanta University or individual faculty members may find it necessary to sever their contractual relationship. To protect the interests of both parties, categories of separation are herein defined, and the policies and procedures related to each are set forth.

Types of Separation:

A.    Resignation (2.8.1)

B.    Retirement (2.8.2)

C.    Nonreappointment (2.8.3)

D.    Prolonged mental or physical illness (2.8.4)

E.    Layoff/termination (2.8.5)

F.    Dismissal for cause (2.8.6)

G.    Action short of dismissal (2.8.7)

H.    Progressive discipline of faculty members (2.8.8)

**2.8.5  Layoff Before Expiration of Current Contract**

Layoff is a severance action by which the university terminates the services of a ranked faculty member before the expiration of the current contract, without prejudice as to performance. . . .

Reasons for layoff include, *but are not limited to the following*:

A.    Major changes in curricular requirements, academic Programs or Departments.

B.    Enrollment emergency.

C.    Financial exigency.

(Emphasis supplied.)

**2.8.5.2    Enrollment Emergency**

Enrollment emergency shall be defined as either a sudden or unplanned progressive decline in student enrollment the detrimental financial effects of which are too great or too rapid to be offset by normal procedures outlined in the Handbook.

The number of FTE [full-time enrolled] students is calculated by the Registrar's Office and is used in determining an enrollment emergency.

The president, after consultation with the University Senate Executive Committee and the Executive Committee of the Board of Trustees, will make the policy declaration of a state of enrollment emergency to the university.

### 2.8.5.3    Financial Exigency

Financial exigency is a rare and serious institutional crisis which is defined as the critical, urgent need of the university to reorder its current fund monetary expenditures in such a way as to remedy and relieve its inability to meet the projected annual monetary expenditures with sufficient revenue.

The Board of Trustees, upon recommendation of the President, who will have consulted with the University Senate, decides a) whether a financial crisis meets the criteria; and b) whether a financial exigency should be declared. The University Senate participates in the decision that financial exigency exists through its Executive Committee and other committees deemed appropriate by the University Senate, which advises the president.

Subsequently, the faculty shall be represented in administrative processes relating to program reorganization or the curtailment or termination of instructional programs because of financial exigency through the Academic Council's Curriculum Committee, and the

Academic Council. Faculty, however, shall not necessarily be represented in individual personnel decisions; the president and the Board of Trustees shall have final authority in all matters related to financial exigency.

The handbook also included very specific procedures for the layoff of faculty members within particular departments.

*Declaration of Enrollment Emergency*

The evidence presented at trial shows that from 1997 to 2005, enrollment at the university declined from 5,740 to 4,469 enrolled students. During this time, the university voluntarily phased out 13 programs.[4] In 2006, after a new vice-principal in charge of enrollment, Darrin Rankin, was hired, enrollment went up. But in 2007, enrollment fell five percent to 4,271 and in the fall of 2008, enrollment fell by almost another five percent to 4,068.

A budget prepared earlier in the spring of 2008 was premised upon a projected "goal of 4,300 students." In order to attain needed revenue, the university needed

---

[4] The phased-out programs were: library science, early childhood education, English education, French education, Spanish education, health and physical education, math education, middle grades education, music education, science education, allied health, international affairs and development, system science, and engineering. In 2002, there were 365 students in the phased-out programs and none by the fall of 2008.

approximately 4,000 students. In October 2008, the university revised its annual operating budget downward almost $4 million based upon 200 fewer students enrolling in the fall of 2008 than had been projected. At that time, the university implemented cost-cutting measures such as a hiring freeze, restricting travel expenses, layoff of staff, and reduced operating budgets. Although the revised budget predicted a savings of close to $4 million from the measures, the president testified that they saved "about a million, 2 million, somewhere in that range."

The president of the university presented the idea of an enrollment emergency and layoff to the Board of Trustees in December 2008, following the start of the Great Recession. At the time, he was "very certain" that the recession would seriously harm enrollment numbers, and he predicted that there would be only 3,400 students in the spring semester.

Rankin disagreed with the president's projection and testified that he predicted an enrollment in the spring of 2009 closer to 4,000 students. In his view, the president was being "overly pessimistic" and he "had no idea what he was basing this 3,400 number on. It seemed to come out of the air." He explained that his own "projections were based on data, based on trends, based on experience." He testified that neither the president nor the Board of Trustees sought his advice about the existence of an

9

enrollment emergency. In his view, "a 6 to 15 percent drop [in students] from the fall to spring" was not an enrollment emergency because it is normal for enrollment to drop between these two semesters.

The Board of Trustees approved the president's decision to declare an enrollment emergency in January 2009. On January 13, 2009, the president advised the university senate that the Board of Trustees had approved an enrollment emergency. The president testified, "The cash shortfall that we estimated at that point would be 6 million by the end of the fiscal year if we remain under current budget cost."

By the third week in January, the university had enrolled 3,700 students. Around this time, the president instructed Rankin to stop all enrollment activity for registered students who had not yet fully paid tuition. Rankin stopped reaching out to additional students, but continued to work with students "who were already in the pipeline." By February 5, 2009, the final number of enrolled students was 3,912. At that time, an additional 88 students were registered, but were later purged from the system based upon a failure to pay tuition fully. Rankin testified that the president's January 2009 instruction to stop enrollment resulted in fewer enrolled students for the spring semester of 2009, but he could not quantify the number.

Rankin testified that up until this time, the university would allow students to make payments "far beyond the census dates." He explained, "The census date is the official day of record, typically 12-15 days after the first day of class . . . By that point students should be enrolled, should be financial, and should be ready to go." He acknowledged that enrollment "should not have gone beyond the census date," but explained, "when you're dealing with 95 percent of the students on financial aid, that is not the way it's going to work. That is not the way Clark Atlanta practiced, irrespective of what they might tell you. The fact of the matter is that they've always registered students far beyond the census date." For example, if a student's scholarship had "fallen through, . . . [e]fforts would be made to try and help the student bridge that gap . . . That was [his] mandate, to do whatever you could to get every single student enrolled because we needed the enrollment numbers." This mandate came from the university president. While the census date is the official date of record for enrollment reported to Department of Education, "what some institutions will do when there are enrollment challenges is they will work beyond the census date and backdate to the census date." He did not know if Clark Atlanta had engaged in this practice.

11

In his testimony at trial, the president "absolutely" agreed "that the university could not declare an enrollment emergency unless the definition of enrollment emergency as defined in the handbook was met" and that it must do so "in good faith." In his view, "actions taken under an enrollment emergency . . . have to be exactly proportional to the emergency," but he readily acknowledged that "the university actually terminated the maximum number of faculty it possibly could without interfering with the efficacy of its programs." The president testified that the census date was the reason he stopped enrollment "because the year before our failure to meet the census date led to an audit finding."

On February 6, 2009, the plaintiffs in this case learned that they had been laid off and were instructed to immediately surrender their keys and identification. Four of the five plaintiffs had tenure, and the other was in a "tenure-track" position with a "probationary/notice contract" that allowed her seven years to attain tenure. On the same day, the president asked for Rankin's resignation based upon an alleged conflict of interest. Rankin testified that he believed the president manufactured a false allegation of a conflict of interest to justify forcing him out during an enrollment emergency for the purpose of preventing him from advising the Board of Trustees that the president had instructed him to stop enrollment.

*Financial Exigency*

The vice-president for academic affairs at the university, Dr. Phillips, who is also a certified public accountant, testified that in his opinion, the university was in a position to declare a "financial exigency," as defined in the faculty handbook, at the time of the professors' layoffs. The president testified that the university would have run out of money by the end of the 2008-2009 academic year "[i]f we continued doing everything we were doing." "If an enrollment emergency had not been declared, it would have been a matter of maybe two months before I would have had to declare a financial exigency." He explained that he "was looking at a gap that I knew by the May, June area would range between $1.7 million to as much as 8 million." The layoff of 54 faculty members and 30 staff employees resulted in a savings of approximately $4.2 to $4.3 million. The president agreed that an increase in enrollment from 3,400 students to 3,900 students would have represented approximately $8 million in revenue in preceding academic years. He denied that this increase "changed the nature of the financial circumstances Clark Atlanta faced."

The president admitted that the university could have suspended an across-the board two percent raise for university employees, voted upon in January 2008, from

13

taking effect in December 2008, but decided not to do so. He denied financing the raise through layoffs.

*The Professors' Claims*

Following their layoffs, the professors filed a lawsuit against the university asserting that it breached its contracts with them in the following ways: (1) declaring an "enrollment emergency" when the requirements for an enrollment emergency did not exist; (2) failing to follow handbook procedures governing the order in which faculty members should be laid off; and (3) terminating the employment of many more employees than required to address the alleged enrollment emergency. They later amended the complaint to allege that the university also breached their contracts by hiring replacements without first offering reinstatement to them. Their alleged damages from the university's breach of contract included "lost wages and benefits of employment, including health insurance and pension benefits and . . . injury to their career paths." They also sought "specific performance of the contracts and . . . reinstatement into their positions from which they were terminated, with full back pay and reinstatement of all benefits." Finally, they asserted a claim for attorney fees and costs of litigation under OCGA § 13-6-11, because the university "intentionally

14

manufactured an enrollment emergency in bad faith, and with knowledge that the requirements for an enrollment emergency had not been met."

*The University's Summary Judgment Motion*

Following discovery, the university moved for summary judgment, asserting that the faculty handbook "was not a contract." In the alternative, it asserted that it complied with the procedures for declaration of an enrollment emergency, that it followed procedures for laying off faculty, and that any alleged failure to follow procedures cannot constitute breach of contract as a matter of law. In their opposition brief, the professors argued that the handbook was part of their contract with the university. In support of their argument that the handbook was incorporated into their contract, they cited law regarding "additional compensation plans." See *Moffie v. Oglethorpe Univ.*, 186 Ga. App. 328 (367 SE2d 112) (1988). They also asserted that the university declared an enrollment emergency in bad faith and failed to follow handbook procedures regarding the order of layoffs and rehiring. The professors also pointed to the financial exigency provision as proof of the university's bad faith, asserting that the facts would have supported the declaration of financial exigency and the concomitant protection of one year's notice and salary to tenured professors.

15

According to the professors, the university "sought a provision it could use to terminate faculty without having to pay severance."

*Summary Judgment Ruling*

In order to address the parties' contentions on appeal, we must outline in detail the trial court's denial of summary judgment to the university and its subsequent limitation of the issues to be determined by the jury. The trial court rejected the professors' claim "that certain aspects of the CAU Faculty Handbook . . . constitute a part of their contracts with CAU. Typically, faculty handbooks do not constitute a contract." The trial court found, however, that Section 2.8.5.5 (a) (2) (b) regarding a "financial exigency" created "an enforceable additional compensation plan." It explained that

> this guarantees a faculty member a certain salary in the event of a layoff and, if CAU declared a financial exigency, it would be bound by this provision. In this case, CAU declared an enrollment emergency, to which 2.8.5.5 (a) (2) (b) does not apply. However, the compensation rights bestowed by 2.8.5.5 (a) (2) (b) necessarily require[] that CAU make a good faith decision between a financial exigency and an enrollment emergency. If this were not the case, then CAU could avoid its obligations by always choosing to declare an enrollment emergency rather than a financial exigency, rendering the additional compensation provision meaningless. The Court finds that there is a genuine issue of

16

material fact as to whether a good faith basis existed for declaring an enrollment emergency and therefore DENIES summary judgment on this issue.

Defendants assert that CAU is relieved of any contractual obligation under the Faculty Handbook because Section 2.0 of the Handbook contains a provision stating that it "shall not be construed as a legally binding contract." The court finds this argument unpersuasive. If CAU is exempted from any responsibility under the provision of the Handbook then tenure at CAU is essentially meaningless. In addition, it would render any additional compensation plans meaningless.

However, the Court finds that the decisions as to which faculty members were laid off are academic decisions falling within the discretion of CAU and the Court will not substitute its judgment for CAU's.

. . .

Plaintiffs allege that CAU has breached their employment contracts by hiring replacements in violation of section 2.8.5.2 of the Handbook. However, the default rule is that "[a]n employer's failure to follow termination procedures in a personnel manual is not actionable under Georgia Law." . . . This provision does not fall under the specific rights relating to tenure, nor does it lay out an additional compensation plan. Therefore, this provision is not binding upon CAU and there is no genuine issue of material fact remaining on this issue.

17

Even if this replacement provision were binding upon CAU, the Court finds that there is not a genuine issue of material fact as to whether this provision has been implicated by CAU's actions. . . . The use of an adjunct professor to teach a class does not replace a ranked faculty position because the responsibilities and benefits to the adjunct faculty member are not comparable to those of a ranked faculty member.

(Citations omitted.) This court subsequently denied the university's application for an interlocutory appeal of the trial court's summary judgment order.

*University's Motion in Limine*

Before trial, the university filed a "Motion in Limine to Exclude Evidence Inconsistent with Scope of Trial as Established by Court's Summary Judgment Order." In this motion, it asserted that "[t]he sole contract issue is whether plaintiffs are entitled to severance pay in connection with CAU's decision to terminate their employment due to an enrollment emergency because CAU should have declared a financial exigency instead of enrollment emergency." In a separate motion in limine, it sought to exclude evidence of the professors' subsequent earnings based upon its contention that the trial court's summary judgment ruling precluded the professors from obtaining "front pay" or "back pay" as damages. According to the university, "the only substantive contract possibly at issue is the 'additional compensation plan'

of Section 2.8.5.5 (a) (2) (b) of the Faculty Handbook, providing for severance benefits in the event of lay off due to financial exigency."

The professors argued against these motions in limine by characterizing them as a "fundamental misstatement of the case."

> The framework for CAU's argument is based on the false premise that if it declared an enrollment emergency in bad faith, it would have declared a financial exigency instead, which would have required that it pay Plaintiffs one year severance. There are several problems with this argument. First, only the Board of Trustees can declare a financial exigency, and they never made such a declaration. Not even the president can declare it. Nevertheless, CAU would now have the jury or this Court declare one for it.

> Second, neither a financial exigency nor an enrollment emergency are self-executing events. If the facts exist which permit the declaration of one or the other, one may be declared. However, neither exists unless it is declared.

> Third, countervailing facts and circumstances existing at the time the enrollment emergency was declared render any factual determinations that CAU would have otherwise declared "financial exigency" sheer speculation. . . . It is not possible - - especially in the procedural posture of a motion in limine - - for this Court to put itself in the shoes of CAU and, in essence by keeping this issue from the jury,

declare as a matter of fact that CAU would have declared financial exigency if it had not declared an enrollment emergency.

. . .

Lastly, CAU ignored the fourth (and most obvious) alternative – that the facts did not exist which would permit it to declare an enrollment emergency *or* a financial exigency.

(Emphasis in original.) The professors also disputed that their sole and exclusive remedy under the contract was severance pay under Section 2.8.5.5 (2) (a) of the handbook. The trial court reserved ruling on these issues until the trial, where it clarified:

> my [summary judgment] order indicated that the part of the handbook, 2.8.5, that contemplated severance of a year's pay for financial exigency because it was a compensation package, I found to be part of the contract. And that if the plaintiffs prevailed by showing that Clark Atlanta had not acted in good faith on declaring an enrollment emergency, that it was the opinion of the Court that the damages would be those contemplated in the financial exigency.

The professors objected to the court's "ruling that if the plaintiffs prevail, they are limited to one year of pay because we do not believe that [the] summary judgment order addressed whether other parts of the handbook are contract[ually] . . . binding,

20

such as the right to continual renewal of the contract for tenured professors." At the conclusion of the trial, the parties agreed that in light of the trial court's previous rulings, the court, rather than the jury, could determine the amount of severance pay owed if the jury determined that the university declared an enrollment emergency in bad faith. The professors' agreement was subject to their previous objection to the trial court's limitation of their damages. They reiterated that the case should not be "characterized as an either/or situation, either enrollment emergency or financial exigency."

*Jury Charge and Verdict*

At the beginning of the its charge to the jury,[5] the trial stated:

This is a case primarily regarding an alleged breach of contract between a university and five professors. The university conducted layoffs of the professors due to an alleged enrollment emergency. The professors alleged that this decision to declare an enrollment emergency was not in good faith, but was instead an attempt to avoid declaring a financial exigency, which would have resulted in additional compensation being paid to the professors according to the contract at issue.

---

[5] It appears that this was read to the jury at the beginning of the trial as well.

The jury found in favor of the plaintiffs "on plaintiffs' claim for breach of contract against Defendant." With regard to the "Plaintiffs' claim for attorney's fees and expenses of litigation for the breach of contract claim against Defendant,"the jury found "that the Defendant acted in bad faith."

*Professors' Argument Regarding Scope of Contract*

1. In Case No. A16A0996, the professors assert that the trial court erred by limiting their damages to that provided by the financial exigency portion of the handbook based upon the trial court's additional compensation plan contract analysis. We agree.

(a) The first step of our analysis is to determine whether the faculty handbook, or any portion thereof, formed a part of the contractual agreement between the university and the professors. The one-page written contracts at issue either offered a "tenure-track appointment" or confirmed rank as a "tenured" professor at the university.

The professors assert that the tenure and tenure-track provisions in the faculty handbook are part of their contract with the university for the following alternative reasons: (1) each contract incorporated the handbook by reference through the language stating that the professors "are subject to and shall abide by the provisions

22

of The Clark Atlanta University Faculty Handbook"; (2) the terms "tenured" and "tenure-track" are not defined in the contract, but can be defined through parol evidence found in the handbook; and (3) the tenure and tenure-track provisions in the handbook are additional compensation plans that form an enforceable part of their contract with the university.

(i) *Incorporation by Reference Argument.* "As a matter of contract law, incorporation by reference is generally effective to accomplish its intended purpose where the provision to which reference is made has a reasonably clear and ascertainable meaning. [Cit.]" *Town Center Assocs. v. Workman*, 227 Ga. App. 55, 57 (1) (487 SE2d 624) (1997). In this case, the following language in the one-page contracts does not make it reasonably clear that all provisions of the faculty handbook are incorporated by reference into the contract, thereby creating mutual obligations on the part of both the university and the professors: "As a member of the faculty, you are subject to and shall abide by the provisions of The Clark Atlanta University Faculty Handbook and any approved revisions thereof, departmental, school and University polices, and the By-Laws of the Board of Trustees." Instead, the "ascertainable meaning" is that only the faculty were contractually obligated to comply with the entirety of the handbook, particularly in light of the handbook's

express provision that it should not be construed as a legally binding contract. See *Shah v. Clark Atlanta Univ.*, 1999 U. S. Dist. LEXIS 22077 at *58-60 (IV) (ND Ga. 1999).

(ii) *Parol Evidence Argument.* It is well-established that parol evidence should only be considered if an ambiguity in the contract cannot be resolved through the rules of contract construction. *Roca Properties v. Dance Hotlanta*, 327 Ga. App. 700, 708 (1) (a) (ii) (761 SE2d 105) (2014). "The 'cardinal rule' of contract construction 'is to ascertain the intention of the parties.' OCGA § 13-2-3. 'Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties.'" (Citations omitted) Id. In this case, it is clear that use of the terms "tenured" and "tenure-track" in the one-page contracts had meaning for the parties, particularly since these words were placed in bold.

OCGA § 13-2-2 (2) provides:

Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning. The local usage or understanding of a word may be proved in order to arrive at the meaning intended by the parties.

24

We will therefore first examine the ordinary meaning of the words "tenured" and "tenure-track." We turn to dictionaries for the usual and common meaning of terms in a contract. See *Akron Pest Control v. Radar Exterminating Co.*, 216 Ga. App. 495, 497 (1) (455 SE2d 601) (1995). The term "tenure" means, among other things, "a status granted after a trial period to a teacher that gives protection from summary dismissal." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/tenure. Black's Law Dictionary (9th Ed. 2009), defines tenure as: "A status afforded a teacher or professor as a protection against summary dismissal without sufficient cause. This status has long been considered a cornerstone of academic freedom. More generally, the legal protection of a long-term relationship, such as employment." "Tenure-track" is defined as "relating to or being in a teaching position that may lead to a grant of tenure." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/tenure-track.

A decision by the Maryland Court of Appeals provides helpful background information with regard to whether tenure and tenure-track might be considered words of art or words used in a particular trade. See *Johns Hopkins University v. Ritter*, 114 Md. App. 77, 81 (689 A2d 91) (1996).

This case concerns "tenure," and it is therefore important to understand what is meant by that term. In education circles generally, and especially at the collegiate level, it denotes a commitment by the school, as a direct or implied part of its faculty employment agreement, that, upon a determination that the faculty member has satisfied the conditions established by the school, the member's employment will be continuous, subject to termination only for adequate cause. Tenure is said to be "awarded" when, in accordance with its policies and procedures, the school determines that the conditions have been satisfied and the faculty member is entitled to the protected status.

Well over 90% of American colleges and universities, public and private, have a tenure system. It is a core part of the college-faculty relationship. Although most tenure systems are based, to some extent, on the 1940 Statement of Principles and Interpretive Comments developed by the Association of American Colleges and the American Association of University Professors, there is no uniform tenure system. There appears, rather, to be a significant variety in the particular plans used in the nation's colleges. As noted in Faculty Tenure, a Report and Recommendations by the Commission on Academic Tenure in Higher Education (1973), the 1940 statement was a statement of principles, "not a prescription of substantive institutional practice." Id. at 2-3. The authors observe:

> "On every aspect of tenure, institutional policies and practices vary: definition of tenure; its legal basis; criteria for appointment, reappointment, and award of tenure;

length of probationary period; categories of personnel eligible for tenure; relationship between tenure and rank; procedures for recommending appointments and awarding tenure; procedures for appeal from adverse decisions; procedures to be followed in dismissal cases; role of faculty, administration, students, and governing board in personnel actions; methods of evaluating teaching, scholarship, and public service; and retirement arrangements. In all these and many more, the range of variation among the 2600 institutions of higher education (and sometimes even within institutions -- from division to division or even from department to department) is enormous."

Tenure may be afforded in a number of ways -- by law, by contract, by moral commitment under an accepted academic code, or simply "by courtesy, kindness, timidity, or inertia." HANDBOOK OF COLLEGE AND UNIVERSITY ADMINISTRATION (ACADEMIC) 6-64 (Asa S. Knowles, ed., 1970). When provided by contract, its terms are usually stated in by-laws adopted by the school and published in a handbook.

(Citations and punctuation omitted.) Id.

Based upon the common understanding of the words "tenured" and "tenure-track," which appear to be terms of art, it is clear that the parties intended that the professors be protected from summary dismissal without sufficient cause. A rule of

contract construction is that a court should "give a reasonable, lawful and effective meaning to all manifestations of intention by the parties. No contractual provision should be rendered meaningless, nor any of its terms mere surplusage." (Citations, punctuation and footnotes omitted.) *Duke Galish, LLC v. Manton*, 308 Ga. App. 316, 319 (1) (707 SE2d 555) (2011). And while the reference to the handbook in the contract was not sufficient to incorporate into the contract by reference *all* of the handbook provisions, the statement that the professors were "subject to" the provisions of the handbook manifests the parties' intent that the scope of the professors' tenure and tenure track protection granted by the one-page contracts would be governed by the handbook.

The fact that the handbook states that it "shall not be construed as a legally binding contract" does not alter this analysis. We are not holding that the handbook itself constituted a contract; instead, we hold that it defines the scope of protection afforded to the "tenured" and "tenure-track" positions provided in the one-page contract between the parties.[6] Additionally, the handbook acknowledges "[w]here the

---

[6] For the same reason, our opinion in *Jones v. Chatham County*, 223 Ga. App. 455, 459 (5) (477 SE2d 889) (1996) does not control. That case stands for the proposition that a personnel manual, standing alone, does not create a contract between the employer and its employees.

terms and provisions of an individual contract of a faculty member are inconsistent with the general policies contained herein, the provisions of the individual contract shall govern." Reliance upon the general statement that the handbook does not constitute a contract to conclude that the tenure protections of the handbook do not govern the scope of the "tenured" or "tenure-track" positions conferred to the professors in their one-page contract would clearly be inconsistent with the one-page contract.[7]

(iii) *Additional Compensation Plan Argument*. Based upon our holding in Division (1) (a) (ii), we need not address whether, and to what extent, the tenure provisions in the handbook are an "additional compensation plan." Compare *Moffie*, supra, 186 Ga. App. at 329 ("conclud[ing] that those portions of the Faculty Handbook dealing with consideration for appointment with tenure and of which plaintiff was aware, form a part of plaintiff's contract of employment" as an additional compensation plan, even though these portions of the handbook were not expressly incorporated by reference into the contract).

---

[7] The federal district court's opinion in *Shah v. Clark Atlanta Univ.*, supra, does not require a different result because that opinion does not address whether the handbook should be used to define the scope of tenure protection conferred by a one-page contract. 1999 U.S. Dist. LEXIS 22077 at * 58-60 (IV).

(b) *Damages*. We next consider whether the trial court erred by limiting the damages which could be recovered by the professors to those which they would have been entitled had the university declared a financial exigency. This limitation resulted from the trial court's previous summary judgment rulings that (1) the handbook should not be considered part of the parties' contract generally, and (2) its decision to define the "additional compensation plan" provided to the parties as the only provision in the contract regarding the guaranty of a certain salary in the event of a layoff due to the declaration of a financial exigency. Based upon our conclusion that the tenure provisions of the handbook defined the scope of the "tenured" and "tenure-track" protection afforded to the professors by their contracts, the trial court erred by limiting the damages the professors could recover for breach of contract to the severance provided in the financial exigency provision of the handbook. The professors were entitled to recover full compensatory damages for any substantive breach of their contracts. See *Board of Regents &c. v. Ambati*, 299 Ga. App. 804, 813 (5) (685 SE2d 719) (2009) (the "burden is on the plaintiff to show both the breach and the damage, and this must be done by evidence which will furnish the jury data sufficient to enable them to estimate with reasonable certainty the amount of damages" (Citation and footnote omitted.)); *Savannah College of Art & Design v.*

30

*Nulph*, 265 Ga. 662 (460 SE2d 792) (1995) (explanation of right to receive compensatory damages for substantive breach of employment contract and nominal damages for procedural breaches of employment contract).

2. *University's Breach of Contract Arguments*. In Case No. A16A0997, the university claims that it was entitled to a JNOV[8] because it did not breach its contracts with the professors. According to the university, the faculty handbook "vests authority and discretion in the President to declare an enrollment emergency, after consultation with the University Senate Executive Committee and with the Executive Committee of the Board of Trustees." It also contends that the discretion exercised by the president was one involving "academic judgment" to which judicial deference was owed; "[i]f there is some basis for his decision, his exercise of that discretion is entitled to substantial deference and is not a breach of any contract." Stated differently, "[t]he question is not whether [the p]resident [] was right or wrong to declare an enrollment emergency; the question is whether he abused his discretion in making the declaration. Since he had a basis for his decision, there can be no abuse of discretion, no breach, and certainly no bad faith."

---

[8] The university did not file a motion for new trial below and does not seek a new trial on appeal.

31

(a) *Absolute and Discretionary Decision-Making Authority*. In support of this claim, the university points to the following well-established law:

> Where an agreement gives a party discretionary decision-making authority, the question is not whether the decision is erroneous; rather, the sole question for a court in reviewing whether the agreement has been breached is whether the decision was made in good faith and involved the exercise of honest judgment. But if an agreement by its express terms grants a party absolute or uncontrolled discretion in making a decision, then no duty of good faith is implied as to that decision, and there can be no breach of the agreement predicated on the decision.

(Citations and punctuation omitted.) *Planning Technologies v. Korman*, 290 Ga. App. 715, 718 (660 SE2d 39) (2008). According to the university, the following provision in the handbook supports its claim that the university president had discretion: "The president, after consultation with the University Senate Executive Committee and the Executive Committee of the Board of Trustees, will make the policy declaration of a state of enrollment emergency to the university." We disagree.

Contracts that provide absolute or uncontrolled discretionary decision-making authority use express language that makes the intent of the parties clear. See, e. g., *Charles v. Leavitt*, 264 Ga. 160 (442 SE2d 241) (1994) (discretion was absolute

where agreement stated that the party would be "the sole judge"); *Automatic Sprinkler Corp. &c. v. Anderson*, 243 Ga. 867, 869 (257 SE2d 283) (1979) (absolute discretion conferred by contract provision stating: "award of any direct incentive compensation is entirely within the discretion of the corporation"); *Knight Indus. v. Turner Mktg.*, 157 Ga. App. 177, 178-179 (276 SE2d 860) (1981) (discretion was absolute where the contract stated that the defendant was vested with "complete and absolute discretion").

Contracts providing for discretionary decision-making subject to a good faith determination also contain express language. For example, in *ULQ, LLC v. Meder*, 293 Ga. App. 176, 178-179 (1) (666 SE2d 713) (2008), we examined the following contract language: "Any officer may be removed as such, either with or without cause, by the Board of Managers whenever in their judgment the best interests of the Company will be served thereby." We concluded

> that although [the company] could terminate [ the officer] without cause, [it] could only do so whenever in its manager's judgment, the best interests of the company would be served thereby. Thus, the power was constrained or qualified; [the company] was allowed the power to terminate [the officer] . . . if and only if [its] manager determined (on behalf of the [company]), in his discretion or judgment, that such was in the best interests of [the company]. . . . Thus, because the determination

33

requisite to terminating an officer was left to the discretion or judgment of [the company]'s manager, and because no language designated that discretion or judgment as absolute or uncontrolled, [the] manager was bound to the exercise of good faith in making the determination that the removal of . . . from office was in the best interests of the company.

(Citations, punctuation and footnotes omitted.) Id.

Here, the contract did not expressly provide either absolute or discretionary decision-making authority to the president; instead it merely set forth objective criteria from which an enrollment emergency could be declared and a procedure for how the university would declare it.

(b) *Academic Judgment.* Having concluded that the contract did not provide the president with express discretionary decision-making authority, we now consider the university's argument that the decision to declare an enrollment emergency is one involving "academic judgment" to which this court should nonetheless defer. Examination of the cases cited by the university reveals that none of them apply this principle to breach of contact actions resulting from the termination of professors due to an alleged enrollment emergency or some other financial crisis.

Academic judgment relates to decisions concerning the admission and dismissal of college students or the decision to offer tenure to a professor in the first

34

instance. See *Regents of Univ. of Michigan v. Ewing*, 474 U. S. 214, 225 (III) (106 SCt 507, 88 LE2d 523) (1985) (noting in case involving dismissal of student from college program that "[w]hen judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment"); *Moffie*, supra, 186 Ga. App. at 330 (concluding "[t]he exercise of academic judgment alone governs the conferring of tenure"); *Jansen v. Emory University*, 440 FSupp. 1060 (ND Ga. 1977) (recognizing that "educational contracts have unique qualities and are to be construed in a manner which leaves the school sufficient discretion to 'properly exercise its educational responsibility'" in case involving dismissal of dental student based upon poor performance). With regard to the decision to offer tenure to a professor, another jurisdiction has noted

> Courts must take special care to preserve a university's autonomy in making lawful tenure decisions when reviewing tenure cases. Because tenure decisions require subjective judgments regarding candidates' qualifications and because of the long-term commitment a decision of tenure necessarily entails, courts should be wary of intruding into the world of university tenure decisions, absent discrimination or other unlawful action by the university.

(Citation omitted.) *Univ. of Baltimore v. Iz*, 123 Md. App. 135, 154 (II) (716 A2d 1107) (1998).

Other cases relied upon by the university involve the denial of an injunction rather than a breach of contract; in one case, the Georgia Supreme Court stated, in dicta, that the "remedy is not to interfere in the control of the university, but is, instead, to seek damages for any individual harm they allege they have suffered." *Moeti v. Clark Atlanta Univ.*, 282 Ga. 164 (1) (646 SE2d 265) (2007) (students and faculty may not enjoin operation and management of private college). See also *Miller v. Alderhold*, 228 Ga. 65 (184 SE2d 172) (1971) (students lacked standing to enjoin private college trustees in connection with sale of college-owned land); *State v. Regents of the Univ. System of Georgia*, 179 Ga. 210, 218 (175 SE 567) (1934) (recognizing discretion of regents to administer university system in case seeking to enjoin regents from entering into contract with federal government agency for a loan); *Davison-Nicholson Co. v. Pound*, 147 Ga. 447 (94 SE 560) (1917) (in case involving the denial of an injunction seeking to preclude university president from influencing students's decision about which vendor to use for purchase of school uniforms, Supreme Court held: "the peculiar relations existing between the governing board of the institution and its students justify the exercise of a certain discretionary control over the action of the latter"). And finally, some decisions contain no discussion whatsoever of academic judgment. See, e. g., *Odem v. Pace Academy*, 235 Ga. App.

648, 652-654 (1) (510 SE2d 326) (1998) (dismissal of teacher for cause based upon insubordination and unsatisfactory professional performance as authorized by contract).

Accordingly, we find that this case does not involve any academic judgment to which this court should defer.

(c) *Evidence Regarding Breach of Contract*. Having rejected the university's arguments with regard to its alleged discretion and the deference due to academic judgment, we now examine whether it was entitled to a JNOV on the professors' breach of contract claims. When reviewing "the denial of a motion for judgment notwithstanding the verdict, this Court is to determine whether there is any evidence to support the jury's verdict . . . In so doing, this Court must construe the evidence in a light most favorable to the prevailing party in the court below. [Cit.]" *Patterson-Fowlkes v. Chancey*, 291 Ga. 601, 602 (732 SE2d 252) (2012).

The handbook clearly authorized the university to terminate the services of a tenured faculty member before the expiration of a current contract through a layoff. It expressly provided: "Reasons for layoff include, *but are not limited to the following*" and then listed "Major changes in curricular requirements, academic Programs or Departments"; "Enrollment Emergency"; and "Financial exigency."

(Emphasis supplied.) Id. The phrase "including, but not limited to" has been interpreted as "broad language of illustration or enlargement." *Hendry v. Hendry*, 292 Ga. 1, 2 (1) n.2 (734 SE2d 46) (2012). It does not introduce an exhaustive list. See Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012) (discussing the "Presumption of Nonexclusive 'Include'"). Thus, it is clear that the three specific reasons listed in the handbook are not the sole reasons for which the university could layoff tenured faculty. See *Jones v. Louisiana Bd. &c. of Univ. of Louisiana Systems*, 809 F3d 231, 240 n.8 (5th Cir. 2015) (noting in case involving termination of tenured professor that policy "contemplated for-cause termination for financial reasons, and also provided that the list of possible justifications 'shall not be deemed exclusive'").

This does not mean, however, that the university was authorized to give any or no reason whatsoever to layoff professors. Instead, the canon of *ejusdem generis*, i. e. "of the same kind or class," applies. Black's Law Dictionary (9th ed. 2009) "Under the rule of ejusdem generis, the words 'including but not limited to' ordinarily should be construed as referring to [reasons] of the same kind as those specially named." *Record Town, Inc. v. Sugarloaf Mills &c.*, 301 Ga. App. 367, 371 (3) (687 SE2d 640) (2009*).* See also *Post v. St. Paul Travelers Ins. Co.*, 691 F3d 500, 520 (II) (D) (1) (b)

38

(ii) (3rd Circ. 2012) ("Under the principle of *ejusdem generis*, [i]t is widely accepted that general expressions such as 'including but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples." (Citation and punctuation omitted.) Similarly, "under the canon of *noscitur a sociis*, the words in [a document] should be understood in relation to each other, since words, like people, are judged by the company they keep." (Citation and punctuation omitted.) *Warren v. State*, 294 Ga. 589, 590 (755 SE2d 171) (2014). But see Bryan A. Garner, *A Dictionary of Modern Legal Usage* (3d Ed. 2011) (stating that phrase "including but not limited to" is "intended to defeat three canons of construction: *inclusio unius est exclusio alterius* ('to express one thing is to exclude another'), *noscitur a sociis* ('it is known by its associates'), and *ejusdem generis* ('of the same class or nature')").

In this case, the evidence presented at trial shows, without dispute, that the university relied upon only the enrollment emergency provision in the faculty handbook to justify its decision to layoff 54 faculty members. Having reviewed the evidence presented at trial as outlined above, we find that a jury could conclude that the university breached its contract with the professors by declaring an enrollment

39

emergency. Specifically, the jury could have concluded that the decline was neither "sudden or unplanned" nor "too great or too rapid to be offset by normal procedures." Therefore, the trial court did not err by denying the university's motion for JNOV.

3. *University's Bad Faith Argument.* In Case No. A16A0997, the university asserts that it was entitled to a JNOV on the issue of its liability for bad faith under OCGA § 13-6-11 in connection with its breach of contract.

> The issue of attorney fees under OCGA § 13-6-11 is a question for the factfinder and an award will be upheld if any evidence is presented to support the award. OCGA § 13-6-11 provides for expenses of litigation where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense. Bad faith warranting an award of attorney fees must have arisen out of the transaction on which the cause of action is predicated. Moreover, we have noted that there may be bad faith in carrying out the provisions of the contract sufficient to support the award. Finally, despite the existence of a bona fide controversy as to liability, a factfinder may find that defendant acted in the most atrocious bad faith in his dealing with the plaintiff. And bad faith may be found in a defendant's conduct if "it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive."

(Citations and punctuation omitted.) *Oglethorpe Power Corp. v. Estate of Forrister*, 332 Ga. App. 693, 705-706 (2) (e) (774 SE2d 755) (2015).

The university asserts that it was entitled to a JNOV because even if the president "was mistaken or even exercised poor judgment as to the factual existence of [an enrollment emergency], the consequences are not tainted as bad faith, but that is the logic the jury followed in punishing him for not obtaining the Board's authorization of a financial exigency instead." While we agree with the university that a failure to pursue financial exigency or a desire to avoid declaration of a financial exigency cannot support the professors' bad faith claim, the facts outlined above provide some evidence from which a jury could conclude that the university declared an enrollment emergency in bad faith.

4. We agree with the university's assertion that the attorney fee award must be vacated because the professors were not permitted to submit sufficient evidence from which the jury could determine "the amount of attorney fees attributed solely to the claim in which they prevailed." *United Cos. Lending Corp. v. Peacock*, 267 Ga. 145, 147 (2) (475 SE2d 601) (1996). The record shows that the professors submitted an itemized bill for their work on the entire case, and that none of the testimony about the amount of the attorney fees nor the bill itself provide an adequate basis for the jury to determine the amounts which should be deducted for the conversion claim on which Dr. Nealy did not prevail at trial. We therefore vacate the attorney fee award

41

and instruct that upon the remand of this case to the trial court, a new trial be had on the amount of attorney fees attributed to (1) the professors' breach of contract claims and (2) to Dr. Nealy's separate negligence claim. Id.

5. The university's remaining enumerations of error in Case No. A16A0997 relating to the recovery of medical benefits and prejudgment interest for liquidated damages are rendered moot by our holding in Division 3.

*Conclusion*

For the reasons explained above, we affirm the judgment with regard to Professor Nealy's negligence damages in the amount of $4,875.00, as well as the jury's determination that the university is liable for breach of contract and bad faith under OCGA § 13-6-11. We vacate the damages portion of the judgment as it relates to breach of contract and attorney fees under OCGA § 13-6-11 and remand with direction for a new trial on these issues only.

*Judgments affirmed in part, and vacated and remanded with direction in part. Barnes, P. J., and Rickman, J., concur.*