A03A0909. ISS INTERNATIONAL SERVICE SYSTEMS, INC.
v. WIDMER.
(589 SE2d 820)

MIKELL, Judge.

ISS International Service Systems, Inc. appeals the judgment entered on the jury's verdict in favor of Jerald N. Widmer in this action for breach of an employment agreement, contending that the trial court erred in denying its motion for directed verdict because (1) the agreement failed to specify an essential element; namely, the nature of the services to be rendered; (2) even if an ambiguity existed, Widmer failed to establish the essential element by parol evidence; (3) the three-year term of employment was unenforceable because it was not severable from the void arbitration provision; (4) the award of litigation expenses was unsupportable; and (5) Widmer failed to prove certain damages. Finding no error, we affirm.

> A directed verdict is proper only if there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. In determining whether any conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for directed verdict. The standard used to review the grant or denial of a directed verdict is the any evidence test.[1]

---

[1] (Footnote omitted.) *Kueffer Crane &c. Svc. v. Passarella*, 247 Ga. App. 327, 328-329 (2) (543 SE2d 113) (2000).

So viewed, the evidence adduced at trial shows that ISS hired Widmer as its assistant treasurer in New York in 1984 and promoted him to the position of treasurer in 1986. At some point, Widmer also was named a vice-president. Widmer reported to Michael L. Dudas, senior vice-president and chief financial officer. Robert Sorrentino managed credit and collections under Widmer's supervision.

Widmer testified that in April 1995, the president and chief executive officer ("CEO") of ISS, Dennis Spina, decided to consolidate certain treasury functions, which were located both in Smyrna, Georgia, and New York, and move them to Smyrna. Spina asked Widmer to transfer to the Smyrna office and to assume additional responsibilities, including accounts payable and payroll. In consideration for having to relocate his elderly parents, wife, and children to the Atlanta area, Widmer negotiated the following agreement with Dudas:

> Per our discussions and mutual agreement, ISS has made a decision to move all Treasury Department related functions to our operations center in Smyrna, Georgia. As part of this move, the company has agreed to reimburse me for expenses I will personally incur relative to this relocation. . . .

> As further assurance to me, ISS has committed to me for three years (through October 31, 1998) of employment in Smyrna, Georgia at an annual salary of $140,000 plus current fringe and non-cash compensation benefits. Any controversy or claim arising out of or related to this agreement shall be settled exclusively by arbitration in the State of Georgia. . . .

The agreement, dated July 17, 1995, was signed by Widmer, as "Vice-President and Treasurer," and by "Michael L. Dudas, Senior Vice-President and Chief Financial Officer." The $140,000 salary, a $24,000 raise, was made retroactive to June 1, according to a memorandum signed by Stephen Ditko, vice-president of human resources.

Widmer authenticated Dudas's signature and testified that Dudas personally handed him the agreement. At the time, Widmer was in Sorrentino's office. Widmer had asked Sorrentino to relocate to the Smyrna office, and Widmer testified that Dudas gave Sorrentino a signed relocation agreement as well. Sorrentino testified that although Ditko told him "sometime after this occurrence . . . that the contracts were not valid," ISS honored all of the provisions of his contract.

After Widmer moved his family to an Atlanta suburb, Spina was terminated. In November 1995, Martin O'Halloran, Dudas's longtime rival became president and CEO. In a meeting held in January,

O'Halloran decided to decentralize corporate functions in a manner that would eliminate the treasury department. According to Widmer, when he and the auditors expressed concerns that O'Halloran's plan would create a problem with certain cash applications, O'Halloran commented, "we're going to do it my way, and frankly I don't need a bunch of high-priced techies telling me what to do." Under orders from O'Halloran, Widmer and Sorrentino began to fire subordinates.

Finally, in April, the finance department held a dinner meeting in Buckhead. After consuming several glasses of wine, Widmer made remarks aimed at undermining O'Halloran's authority. Those comments were reported to O'Halloran, who terminated Widmer five weeks later, on May 7, 1996. Widmer and two other "high-priced techies," Dudas and Jorge Lindvig, the vice-president of data processing, were fired at the same time. The position of treasurer was eliminated.

Ditko testified that O'Halloran had commented that he could bring in people whose salaries were much lower than those of their New York predecessors. According to Ditko, O'Halloran also remarked that Widmer, Dudas, and Lindvig were fired because they were not "team players" and did not support his strategies.

Robert Atkins, Jr., who was senior vice-president and general counsel of ISS in 1995, testified that prior to July 17, Widmer mentioned that he had negotiated a three-year employment contract with Dudas. Atkins testified that Dudas possessed the authority to execute contracts on behalf of ISS and often did so. Finally, Atkins testified that an internal memorandum stating that "[n]o employee contracts, agreements, consultancy arrangements, etc. are authorized or valid without the signature of the Chief Operating Officer [(COO)] and [CEO]" was not intended to apply to contracts affecting corporate personnel. Rather, it was meant to correct a problem that had emerged with regional and branch managers executing agreements of which the corporate office had no knowledge. Atkins testified that since the COO had no authority over corporate personnel, his signature on corporate contracts would make no sense.

ISS accused Widmer of "cook[ing] up phoney contracts" with Dudas to protect their jobs. Widmer denied the allegation. ISS's fraud claim was based in part on the fact that Widmer's agreement, which consisted of two pages, was typed on different versions of ISS stationery. O'Halloran testified that the second page was typed on letterhead which did not exist when the agreement was created. Widmer testified that he prepared the agreement at home using stationery he kept in a filing cabinet and that once it was created, he never made any changes to it.

O'Halloran admitted Dudas told him that Widmer had an employment contract and that Dudas eventually gave him a copy of the agree-

ment at issue. However, before showing O'Halloran a copy, Dudas had also indicated that Spina had signed the agreement, as required by company policy. Spina testified that he was never made aware that Widmer was negotiating an employment contract with Dudas. In addition, O'Halloran testified that Widmer was fired because he was uncooperative and insubordinate. Finally, O'Halloran testified that he did not fill the treasurer position because he discovered accounting irregularities, for which Dudas is under investigation by the Securities and Exchange Commission. Dudas was accused of overstating corporate profit by $147 million. When deposed concerning the events surrounding this lawsuit, Dudas invoked his Fifth Amendment privilege against self-incrimination.

On a special verdict form, the jury found that the agreement was signed by Dudas; that Dudas had actual authority to enter into the agreement on behalf of ISS; that ISS failed to prove that the agreement was a fraud perpetrated by Dudas and Widmer; that ISS was aware of the existence of the agreement and ratified its terms; that the parties orally agreed to each of the essential terms of an employment contract prior to signing the agreement; and that ISS failed to prove that Widmer was terminated for cause. The jury awarded Widmer $466,560 for breach of contract, and $130,004 in attorney fees. After subtracting $74,154 in mitigated damages, the jury awarded total damages of $522,410. The court then subtracted $97,240.63 owed on ISS's counterclaim, awarded prejudgment interest under OCGA § 7-4-15, and entered judgment in the amount of $487,043.83.

1. ISS contends that the agreement is void because it lacks an essential term; namely, the nature of the services to be rendered, and that the trial court erred in finding the agreement ambiguous and admitting parol evidence to supply the missing term.[2]

ISS's brief cites a line of cases, emanating from *Weill v. Brown*,[3] which provide that an employment contract must describe the nature and character of the services to be performed, the place of employment, and the amount of compensation to be paid, or else it is too indefinite to be enforceable.[4] Although the principle is apt, the cases cited by ISS are factually distinguishable. In *Zager v. Brown*, the purported contract was addressed to "Whom It May Concern," was

---

[2] ISS filed two motions for summary judgment on this ground. The first was denied by then Fulton County State Court Judge, now Court of Appeals Judge, Yvette Miller, and the second was denied by Judge Diane Bessen.

[3] 197 Ga. 328 (29 SE2d 54) (1944).

[4] Id. at 333. See also *Zager v. Brown*, 242 Ga. App. 427, 430 (1) (530 SE2d 50) (2000); *Laverson v. Macon Bibb County Hosp. Auth.*, 226 Ga. App. 761, 762 (487 SE2d 621) (1997); *Sawyer v. Roberts*, 208 Ga. App. 870, 871 (432 SE2d 610) (1993); *McTerry v. Free for All Missionary Baptist Church No. 1*, 129 Ga. App. 724 (200 SE2d 915) (1973); *Farr v. Barnes Freight Lines*, 97 Ga. App. 36, 37 (1) (101 SE2d 906) (1958).

not signed by the plaintiff/employee, did not indicate the duties to be performed by him as "Director," nor the place where the duties were to be performed.[5] In *Laverson v. Macon Bibb County Hosp. Auth.*, the plaintiff produced no evidence of the amount of compensation that the defendant allegedly offered him as a post-graduate medical resident.[6] In *Sawyer v. Roberts*, the plaintiff's three-year contract provided only her salary and work hours; it was completely silent as to the nature of the services to be rendered or the place of employment.[7] Similarly, the one-year contract in *McTerry v. Free for All &c.* stated only the plaintiff's salary and was silent as to the nature and character of the services to be performed.[8] The contract in *Farr v. Barnes Freight Lines* provided only that plaintiff was "to do all work required of him."[9] Again, the contract was silent as to plaintiff's position or the services to be rendered.

The agreement in the case at bar does not suffer the infirmity of silence as to Widmer's responsibilities thereunder. Rather, the trial court correctly found it ambiguous. As noted above, the document reads: "Per our discussions and mutual agreement, ISS has made a decision to move all Treasury Department related functions to our operations center in Smyrna, Georgia." Widmer signed the contract as "Vice-President and Treasurer." The reference to Widmer's position as treasurer, coupled with ISS's acknowledgment that the company intended to move that department to Smyrna, created an ambiguity as to whether Widmer would remain treasurer after the move to Smyrna and whether his duties would change. Similarly, we held in *Gram Corp. v. Wilkinson*[10] that the term "office manager" in the plaintiff's employment contract, in addition to the statement that the plaintiff's duties would be "prescribed and directed by [the employer's] president," was ambiguous because it did not specify the duties associated with the position.[11] Accordingly, in *Gram Corp.*, as in the case at bar, parol evidence was admissible to explain the ambiguity.[12]

Finally, although ISS correctly notes that a contract is construed against the drafter, "[i]t is well-settled that the policy of the law is against the destruction of contracts on the ground of uncertainty if it is possible in the light of the circumstances under which the contract

---

[5] *Zager*, supra at 429-430 (1).
[6] *Laverson*, supra at 762-763.
[7] *Sawyer*, supra at 871.
[8] *McTerry*, supra.
[9] (Punctuation omitted.) *Farr*, supra.
[10] 210 Ga. App. 680 (437 SE2d 341) (1993).
[11] Id. at 681 (1).
[12] Id.

was made to determine the reasonable intention of the parties."[13] It was possible to determine the parties' intention under the circumstances presented in this case. The trial court did not err in denying the motion for directed verdict on this ground.

2. ISS next argues that, assuming an ambiguity existed as to the nature of the services to be rendered, Widmer failed to establish this element by parol evidence. The trial court denied ISS's motion for directed verdict on this issue, and our sole mission on appellate review is to determine whether any evidence supports the jury's verdict. "The question before this court is not whether the verdict . . . [was] merely authorized, but is whether a contrary [verdict] was demanded."[14]

Examining the record in light of this standard, we conclude that the trial court did not err in submitting this issue to the jury. On direct examination, Widmer testified that he remained treasurer from 1986 through his termination date, and he delineated his duties throughout his 12-year employment with ISS. Widmer further testified that, in connection with the transfer, Spina asked him to assume responsibility for accounts payable, which were then handled by a staff of 12 in Smyrna, and to take on part of the payroll function as well. On cross-examination, Widmer testified that he expected to retain the same title and to take on such other additional responsibilities as Spina might assign.

Contrary to ISS's argument, we do not find this testimony fails to establish a meeting of the minds as a matter of law as to the nature of Widmer's responsibilities when the agreement was created.[15] Sufficient parol evidence was introduced from which the jury could discern the nature of Widmer's services to be performed under the contract. There was evidence from which the jury could find that the parties intended for Widmer to continue as treasurer, assume responsibility for accounts payable and at least a portion of payroll, and to handle such other assignments as Spina deemed appropriate in light of his reorganization of the company.

Finally, "part performance of the contract is sufficient to validate an otherwise vague and objectionable document, provided that the part performance itself relates to the contested clause."[16] The evi-

---

[13] (Citations and punctuation omitted.) Id.

[14] (Citations omitted.) *Golden Peanut Co. v. Bass*, 249 Ga. App. 224, 237 (3) (547 SE2d 637) (2001).

[15] See *Lifestyle Family, L.P. v. Lawyers Title Ins. Corp.*, 256 Ga. App. 305, 308 (1), n. 3 (568 SE2d 171) (2002) ("Under OCGA § 13-3-1, the plaintiff in a breach of contract action has the burden of proving three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms."). Accord *Gill v. B & R Intl.*, 234 Ga. App. 528, 531 (1) (b) (507 SE2d 477) (1998).

[16] *Touche Ross & Co. v. DASD Corp.*, 162 Ga. App. 438, 439-440 (2) (292 SE2d 84) (1982).

dence shows that Widmer performed as treasurer from the date the agreement was executed until his termination and that he was paid a salary equivalent to $140,000 per annum to do so. It follows that the trial court did not err in denying ISS's motion for directed verdict on this issue.

3. At the outset of this litigation, ISS moved to dismiss the complaint based on the agreement's arbitration clause, which provides that "[a]ny controversy or claim arising out of or related to this agreement shall be settled exclusively by arbitration." Under OCGA § 9-9-2 (c) (9), an arbitration clause in an employment contract is unenforceable unless the clause "is initialed by all signatories at the time of the execution of the agreement." Because the arbitration clause in Widmer's agreement was not initialed by either party, the trial court found it unenforceable and denied the motion. The trial court rejected ISS's argument that the unenforceability of the clause rendered the entire agreement unenforceable because it contained neither a severability clause nor language suggesting that the parties intended the contract to be severable. Rather, the court found that the contract was severable because it contained multiple promises based upon multiple considerations.[17] At trial, ISS moved for a directed verdict on this ground. In its third enumerated error, ISS challenges the denial of its motion, arguing specifically that the three-year term of employment, which was contained in the same paragraph as the arbitration provision, was not severable from the arbitration clause and was therefore unenforceable. ISS's argument fails.

A contract is either severable or entire, depending on the parties' intent.[18] "In an entire contract, the whole contract stands or falls together. In a severable contract, the failure of a distinct part does not void the remainder."[19]

> The rule is that where an agreement consists of a single promise, based on a single consideration, if either is illegal, the whole contract is void. But where the agreement is founded on a legal consideration containing a promise to do several things or to refrain from doing several things, and only some of the promises are illegal, the promises which are not illegal will be held to be valid.[20]

---

[17] See, e.g., *Vegesina v. Allied Informatics*, 257 Ga. App. 693 (572 SE2d 51) (2002).
[18] OCGA § 13-1-8.
[19] OCGA § 13-1-8 (a).
[20] (Citation omitted.) *Vegesina*, supra at 694 (1). Accord *Bulloch South, Inc. v. Gosai*, 250 Ga. App. 170, 174-175 (1) (b) (550 SE2d 750) (2001).

The agreement at issue contained multiple promises based on multiple considerations. For instance, the entire first page, and the first paragraph of the second page, are devoted to Widmer's promise to relocate to the Smyrna office, in light of the transfer of his department to that office, in exchange for ISS's promise to reimburse him for certain itemized expenses he expected to incur in connection with the relocation. The next paragraph, which started with the phrase, "[a]s further assurance to me," stated the term of employment and salary, followed by the arbitration clause. Accordingly, we find that the agreement was severable. The unenforceability of the arbitration clause did not void the remainder of the agreement.

4. ISS next assigns error to the denial of its motion for directed verdict on the issue of litigation expenses under OCGA § 13-6-11, which permits the jury to award attorney fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." If a bona fide controversy exists, the plaintiff may recover attorney fees under this Code section only if the defendant has acted in bad faith in the underlying transaction.[21] Issues regarding the existence of a bona fide controversy or a defendant's bad faith are generally for the jury to decide.[22] Finally, an award of attorney fees under OCGA § 13-6-11 should be affirmed if there is any evidence to support it.[23]

ISS argues that the record demonstrates a bona fide controversy and contains no evidence of bad faith, stubborn litigiousness, or causing Widmer unnecessary trouble and expense. Pretermitting whether the evidence demanded a finding that a bona fide controversy existed as to ISS's liability, we cannot say that no evidence was presented to show that ISS acted in bad faith in terminating Widmer and refusing to honor his agreement. There was evidence that Widmer was a senior executive who provided 12 years of loyal service to ISS. Testimony was also presented that O'Halloran had expressed a desire to terminate highly compensated employees. The jury could have concluded from this evidence that Widmer was terminated because of his high salary. Evidence was also presented that ISS knew the terms of Widmer's agreement well in advance of his termination. Jan Kaupas, who was COO at the time the agreement was executed, testified that he attended a meeting with Widmer, Spina, and Dudas prior to Widmer's relocation. Dudas asked Spina whether he had made a final decision regarding Widmer's contract, and Spina

---

[21] *Latham v. Faulk*, 265 Ga. 107, 108 (2) (454 SE2d 136) (1995), citing *Dimambro Northend Assoc. v. Williams*, 169 Ga. App. 219, 225 (6) (312 SE2d 386) (1983).

[22] *Southern Co. v. Hamburg*, 220 Ga. App. 834, 841 (4) (470 SE2d 467) (1996); *Toncee, Inc. v. Thomas*, 219 Ga. App. 539, 542 (3) (466 SE2d 27) (1995).

[23] *Toncee, Inc.*, supra.

told Dudas to do what was "reasonable and fair." Kaupas further testified that when he tried to negotiate lengthy employment terms for two employees who reported to him, Spina said, "No, we're not giving longer terms like that any more. . . . Jerry had different circumstances." O'Halloran admitted seeing a copy of the agreement before he terminated Widmer. Based on this evidence, the jury could have found that O'Halloran chose to ignore the agreement rather than pay any more money to a "high-priced techie." The trial court did not err in submitting the issue of attorney fees to the jury.

5. Finally, ISS argues that Widmer failed to prove his damages to a reasonable degree of certainty. "The burden is on the plaintiff to show both the breach and the damage, and this must be done by evidence which will furnish the jury data sufficient to enable them to estimate with reasonable certainty the amount of damages. It cannot be left to speculation, conjecture and guesswork."[24]

In the lone case cited by ISS, *Hosp. Auth. of Charlton County v. Bryant*, the plaintiff, who filed an action for breach of contract alleging failure to pay for services rendered, failed to introduce evidence of his expenses, which would have been deductible from the amount awarded to him. However, in the case at bar, Widmer introduced evidence of both the sums owed to him and the amounts he owed ISS. He testified that he was owed $347,365 in salary for 26 months remaining on his contract and that ISS was due a credit of $74,154 based on Widmer's earnings in 1996, 1997, and 1998 of $5,330, $24,300, and $44,424 respectively. Thus, Widmer calculated his net salary due as $273,211. Widmer further testified that he had incurred expenses totaling $79,637, which the company had failed to reimburse; that based on the company handbook, he calculated that ISS owed him $94,542 in fringe benefits; that ISS was entitled to a $65,000 credit for moving expenses and a cash advance; and that ISS owed him $19,170 in taxes on those expenses. This testimony provided the jurors with "data sufficient to enable them to estimate with reasonable certainty the amount of damages."[25] The trial court did not err in denying ISS's motion for directed verdict on this ground.

*Judgment affirmed. Johnson, P. J., and Eldridge, J., concur.*

DECIDED AUGUST 13, 2003 —
RECONSIDERATION DENIED NOVEMBER 12, 2003 — 

---

[24] (Citations and punctuation omitted.) *Hosp. Auth. of Charlton County v. Bryant*, 157 Ga. App. 330, 331 (2) (277 SE2d 322) (1981).
[25] (Citations and punctuation omitted.) Id.

*Jackson, Lewis, Schnitzler & Krupman, Michael S. Kun, C. Todd Van Dyke*, for appellant.

*Scheer, Jackson, Cohen & Schoenberg, Brant Jackson, Jr.*, for appellee.