**FIRST DIVISION**
**BARNES, P. J.,**
**MARKLE and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.gov/rules**

**May 22, 2026**

# In the Court of Appeals of Georgia

A26A0633. GALLOWAY v. TOTAL PLAY, LLC.

BARNES, Presiding Judge.

This case centers on a dispute over the enforceability under the Georgia Restrictive Covenants Act ("GRCA"), OCGA § 13-8-50 et seq., of the restrictive covenants in a release and an employment agreement. Total Play, LLC sued its former employee, William Brent Galloway, for among other things, breach of the non-compete and non-solicitation covenants contained in a release and in his employment agreement and for attorney fees and expenses under OCGA § 13-6-11. During the ensuing jury trial, the trial court directed a verdict in favor of Galloway on Total Play's claims for breach of the non-solicitation covenants and on its claim for compensatory damages, and the court directed a verdict in favor of Total Play on its claim for breach

of the non-compete covenant in the release. The jury subsequently awarded nominal damages to Total Play on its claims for breach of the non-compete covenants and OCGA § 13-6-11 attorney fees, and the trial court entered judgment on the verdict. Galloway now appeals, contending that the trial court erred in denying his initial and renewed motions for summary judgment on the enforceability of the non-compete and non-solicitation covenants; erred in failing to grant a directed verdict in his favor on Total Play's claims for breach of the non-compete covenants and in granting a directed verdict to Total Play on one of those claims; and erred in failing to direct a verdict in his favor on Total Play's attorney fees claim and in entering judgment on the fees award.

For the reasons discussed below, we decline to address the trial court's summary judgment rulings because they are moot, and we affirm the trial court's rulings on the motions for directed verdict. However, because Total Play proved only the lump sum amount of attorney fees that it incurred in litigating the entire case, we reverse the judgment entered on the attorney fees award and remand for an evidentiary hearing for Total Play to establish either the portion of the awarded fees

2

that were attributable solely to its prevailing claims or that the claims were so interwoven that segregation of its fees was not possible.

Following a jury verdict, we view the evidence in the light most favorable to the prevailing party. *Yash Solutions v. New York Global Consultants Corp.*, 352 Ga. App. 127, 132(1) (834 SE2d 126) (2019). So viewed, the evidence presented at trial showed that Total Play is a North Carolina limited liability company that, during the time period in question, engaged in the "redemption route business." Its business included selling, operating, and distributing coin-operated video gaming machines for use in convenience stores, bars, restaurants, and other locations. All of Total Play's existing routes and customers were located in North Carolina, but it planned to expand into markets in other states and began taking steps to do so.

Michael Macke is the sole owner of Total Play. Macke also owns several affiliated companies involved in the redemption route business in various states, including Liberty Games, LLC, which operated in Virginia during the pertinent time period. Because Total Play and Liberty Games were both owned by Macke and operated the same type of businesses, there was cost-sharing among the companies, and Total Play shared its gaming equipment and personnel with Liberty Games and

3

assisted Liberty Games in developing and managing the Virginia market. Macke testified that "Liberty Games was set up in Virginia to facilitate the movement of games into the Virginia market that was going to be . . . run by Total Play."

In March 2017, Total Play hired Galloway as a route manager in North Carolina and also to develop and manage new routes in other states, including Virginia. In return for Galloway joining the company, Total Play agreed to pay him "certain extraordinary payments . . . on a periodic basis over and above [his] salary and bonus." However, a dispute arose between the parties regarding the specific terms of their agreement.

On April 15, 2019, Total Play, Macke, and Galloway resolved their dispute through execution of a release agreement ("Release"). Under the Release, Total Play agreed to pay Galloway $250,000, and in return Galloway, among other things, agreed to release Total Play, Macke, and Macke's other affiliated companies from his claim to periodic "extraordinary payments." Pursuant to a non-compete covenant in the Release, Galloway also promised that he would not engage in the redemption route business in North Carolina and Virginia for a period of five years from the date of the Release (i.e. until April 15, 2024), other than in his role as an employee of Total Play.

4

Galloway further agreed to a non-solicitation covenant under which he would refrain from soliciting Total Play customers with whom he had material contact during his employment for a period of five years from the date of the Release.

On the same day that the parties executed the Release, Total Play and Galloway executed an employment agreement that addressed Galloway's continued employment and compensation with Total Play ("Employment Agreement"). According to the Employment Agreement, Total Play "had operations in North Carolina[ ] and [had] recently expanded into other markets" and desired to change Galloway's "compensation arrangement in light of [Total Play's] expanding markets and opportunities." In return for his new compensation arrangement, Galloway agreed to several restrictive covenants. Under a non-compete covenant, Galloway promised that for a period of two years following his termination with Total Play, he would not engage in the redemption route business in the territory where he "is working at the time of termination of his employment with [Total Play]." Pursuant to a non-solicitation covenant, Galloway agreed not to solicit customers of Total Play with whom he had material contact during his employment for a period of two years after his termination.

During his employment with Total Play, Galloway worked to establish and manage new routes in North Carolina and Virginia, among other states. According to Macke, the plan was for Total Play to "build the business" in Virginia by signing up customers with Liberty Games, with Galloway "spearheading" that development. Macke testified that Galloway was hired to "go to Virginia, try to develop the business, and then we would move that into his wheelhouse to manage and run and operate." Galloway was "the manager in Virginia" and traveled there almost every week. As part of his duties in Virginia for Total Play, Galloway would solicit and sign up new customers, install gaming machines, collect weekly revenues, and manage other Total Play employees who assisted him in those duties. Any gaming contracts ultimately signed by customers in Virginia would be with Liberty Games, as that was the affiliate that was already conducting business there. Total Play paid Galloway commissions based on the contracts he procured in Virginia, and Liberty Games would reimburse Total Play for the commissions paid to Galloway. While working in Virginia, Galloway used a car and cell phone provided to him by Total Play, had a Total Play business card and email address, and was paid his salary and commissions through Total Play.

After a dispute arose over his commissions, Galloway voluntarily terminated his employment with Total Play on August 8, 2021. At the time of his termination, Galloway's territories included Virginia. During that time period, the video game redemption business in Virginia had been temporarily halted due to a statute adopted by the Virginia legislature, but the gaming business resumed by the end of that year. While Total Play did not collect revenues or sign up new customers during the time when business in Virginia was halted, Total Play kept its gaming machines and personnel in the state for future operation, and Galloway continued to manage his accounts there by maintaining relationships with customers, answering their questions about the evolving legal situation, and attempting to address their concerns.

Following the termination of his employment with Total Play, Galloway retained confidential "collector reports" generated by Total Play that included the contact and financial information of Virginia customers. Galloway signed an employment agreement with a competitor of Total Play, but the competitor terminated Galloway after Total Play's counsel warned it about the restrictive covenants. Galloway thereafter contacted several Virginia customers with whom he had contact when he worked for Total Play and placed 50 of his own video gaming

systems in 20 other locations in the state. Galloway admitted that he was aware of the restrictive covenants in the Release and Employment Agreement and had received two letters from Total Play after his termination reminding him of those covenants. Galloway admitted that he intentionally violated the covenants by engaging in the redemption route business in Virginia because he was angry with Macke and believed that Macke had cost him his new job with Total Play's competitor. In a subsequent series of texts to Macke, Galloway claimed that the routes "are MINE and are with me at the flick of a switch."

In January 2022, Total Play filed the present suit against Galloway. Among other things, Total Play asserted that Galloway breached the non-compete and non-solicitation covenants in the Release and Employment Agreement through his post-termination activities in Virginia. Total Play sought damages for breach of the covenants in addition to attorney fees and expenses of litigation under OCGA § 13-6-11.

Galloway moved for summary judgment, contending that the non-compete and non-solicitation covenants in the Release and Employment Agreement were unenforceable under the GRCA, OCGA § 13-8-50 et seq., because they lacked

reasonable geographic, scope, and time limitations. The trial court conducted a hearing and denied the motion. Galloway subsequently renewed his motion for summary judgment, which the trial court denied.

A jury trial ensued. After Total Play rested its case-in-chief, Galloway moved for directed verdict on Total Play's claims. The trial court granted Galloway a directed verdict on Total Play's claims for breach of the non-solicitation covenants in the Release and Employment Agreement. The court found that Total Play had presented no evidence that Galloway breached those covenants through his post-termination activities in Virginia because Total Play (as opposed to non-party Liberty Games) had no customers in that state, and the covenants by their terms only applied to Total Play's own customers. The trial court also directed a verdict on Total Play's compensatory damages claims predicated on the non-compete covenants because Total Play (in contrast to Liberty Games) had not shown any loss of revenue from the alleged breaches of those provisions, but the court ruled that Total Play could seek nominal damages. The trial court denied Galloway's motion for directed verdict in all other respects.

At the close of all the evidence, Galloway again moved for a directed verdict on Total Play's remaining claims, renewing his prior arguments raised in his motions for summary judgment and for a directed verdict. The trial court denied the motion. Total Play also moved for a directed verdict on its claim for breach of the non-compete covenant in the Release, contending that Galloway's admissions at trial regarding his post-termination activity in Virginia established uncontrovertedly that the covenant had been breached because by its express terms it prohibited competition in Virginia. Galloway opposed the motion, reiterating his arguments regarding the enforceability of the covenant that were raised at the summary judgment stage. The trial court granted Total Play's motion for directed verdict on the issue of breach of the Release's non-compete covenant but ruled that Total Play would be limited to seeking nominal damages on that claim.

The trial court submitted Total Play's remaining claims to the jury. On a special verdict form, the jury found that Galloway breached the non-compete covenant in the Employment Agreement and was entitled to nominal damages of $1.00 for breach of the non-compete covenants. The jury further found that Total Play was entitled to $126,220.53 in attorney fees and expenses because Galloway was stubbornly litigious,

acted in bad faith, or put Total Play to unreasonable trouble and expense.[1] The trial court entered judgment on the verdict, and this appeal by Galloway followed.

1. Galloway contends that the trial court erred in denying his initial and renewed motions for summary judgment on Total Play's claims for breach of the non-solicitation covenants in the Release and Employment Agreement. However, as previously noted, the trial court directed a verdict in favor of Galloway on the non-solicitation claims, and Total Play has not filed a cross-appeal challenging that ruling. The trial court's summary judgment rulings on the non-solicitation claims are thus moot. See *Moore v. Moore*, 281 Ga. 81, 83(3) (635 SE2d 107) (2006) (explaining that a directed verdict, where not overturned on appeal, renders the denial of summary judgment moot).

---

[1] In its complaint, Total Play also asserted claims against Galloway for breach of confidentiality provisions contained in the Release and Employment Agreement, for breach of an oral loan agreement, and for money had and received. In its special verdict upon which the trial court later entered judgment, the jury found Galloway liable for breach of the confidentiality provisions, found in favor of Galloway on Total Play's claim for breach of an oral loan agreement, and found that Galloway was liable for money had and received and awarded Total Play restitution damages and prejudgment interest on that claim. On appeal, Galloway does not challenge the trial court's summary judgment and directed verdict rulings and entry of judgment on any of these claims.

2. Galloway also argues that the trial court erred in denying his initial and renewed motions for summary judgment on Total Play's claims for breach of the non-compete covenants in the Release and Employment Agreement. We decline to consider this enumeration of error because the general rule, applicable here, is that "after a verdict and judgment, review of an order denying summary judgment is moot." *Rowe v. Law Offices of Ben C. Brodhead, PC.*, 319 Ga. App. 10, 17(3) n.7 (735 SE2d 39) (2012). But we will consider the trial court's denial of Galloway's motions for directed verdict, which incorporate the same arguments regarding the enforceability of the non-compete covenants asserted at the summary judgment stage. See *Certain Underwriters at Lloyd's of London v. Rucker Constr.*, 285 Ga. App. 844, 845(1) (648 SE2d 170) (2007). See also *Rowe*, 319 Ga. App. at 16(3) (addressing appellant's contention that trial court erred by denying motions for a directed verdict on the enforceability of the contract at issue after holding that the court's summary judgment ruling on the same ground was moot).

3. In challenging the trial court's directed verdict rulings, Galloway contends that the trial court erred in finding that the non-compete covenants in the Release and Employment Agreement were enforceable under the GRCA because the covenants

were unreasonable in geographic scope. According to Galloway, the geographic area encompassed by the covenants was unreasonable because it included Virginia, a state in which the uncontroverted evidence showed that Total Play did not do business. Galloway emphasizes that the evidence demonstrated that Total Play (as opposed to Liberty Games) had no routes, customers, or contracts of its own in Virginia, was not registered to do business there, and did not generate any revenue in that state.

The GRCA, OCGA § 13-8-50 et seq., "governs the enforceability of restrictive covenants in Georgia," *N. Am. Senior Benefits v. Wimmer*, 319 Ga. 641, 641 (906 SE2d 373) (2024), and it "reflects a more permissive and flexible approach to restrictive covenants compared to what had developed through [prior] decisional law." *Motorsports of Conyers v. Burbach*, 317 Ga. 206, 214(2)(c)(ii) (892 SE2d 719) (2023). The GRCA authorizes the "enforcement of contracts that restrict competition during the term of a restrictive covenant, so long as such restrictions are reasonable in time, geographic area, and scope of prohibited activities." OCGA § 13-8-53(a). See *N. Am. Senior Benefits*, 319 Ga. at 641.

To determine whether the geographic scope of a non-compete covenant is reasonable, trial courts must take into account the totality of the circumstances. *N.*

13

*Am. Senior Benefits*, 319 Ga. at 648(2). The geographic scope is presumed reasonable if it "includes the areas in which the employer does business at any time during the parties' relationship," and "[t]he total distance encompassed by the provisions of the covenant also is reasonable." OCGA § 13-8-56(2). See *N. Am. Senior Benefits*, 319 Ga. at 647(2). In addition, even before enactment of the more permissive GRCA, Georgia courts generally considered a geographic restriction limited to the territory where the employee worked for the employer to be reasonable in scope. See *W. R. Grace & Co. v. Mouyal*, 262 Ga. 464, 466 (422 SE2d 529) (1992) ("A restriction relating to the area where the employee did business on behalf of the employer has been enforced as a legitimate protection of the employer's interest."); *Chaichimansour v. Pets Are People Too, No. 2*, 226 Ga. App. 69, 71(1) (485 SE2d 248) (1997) (concluding that territorial restriction was reasonable, where the restriction was "specific, narrow, and closely tied to where [the defendant] actually worked for plaintiff up until the time she left").

Whether a geographic restriction is reasonable is a question of law for the trial court to resolve. *Rollins Protective Servs. Co. v. Palermo*, 249 Ga. 138, 139(1) (287 SE2d 546) (1982). Answering that question, however, turns on the factual circumstances of the case as determined by the trial court. See id.; *N. Am. Senior Benefits*, 319 Ga. at

649(2). And "[o]n appeal the evidence is to be construed so as to uphold rather than overturn the judgment of the trial court." *Rollins Protective Servs. Co.*, 249 Ga. at 140(1) (quotation marks omitted).

Guided by this standard of review, we conclude that there was some evidence to support the trial court's determination that the inclusion of Virginia within the geographic scope of the non-compete covenants was reasonable. Although Total Play did not itself have any routes, customers, contracts, or revenue in Virginia, there was evidence that Total Play had some of its own gaming equipment and employees in the state, including Galloway, and that part of its business model was to solicit and obtain customers there for its affiliate Liberty Games and then to manage those accounts for Liberty Games. Moreover, there was evidence that while in Virginia, Galloway used a car and cell phone provided to him by Total Play, held himself out as Total Play employee, and was paid his salary and commissions by Total Play for the work he performed in that state. This combined evidence, construed in favor of the judgment, authorized the trial court's finding that Total Play did business in Virginia and that Galloway performed services for Total Play there.

15

There also was evidence that Total Play had legitimate business interests to protect in Virginia. See OCGA § 13-8-55 ("The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant."); *N. Am. Senior Benefits*, 319 Ga. at 648(2) (in assessing the reasonableness of a geographic restriction, courts should consider "the business interests justifying the restrictive covenant"). Legitimate business interests include, but are not limited to, substantial relationships with others for or on whose behalf a business acts. See, e. g., OCGA § 13-8-51(9)(C) ("'Legitimate business interest' includes, but is not limited to . . . [s]ubstantial relationships with specific prospective or existing customers, patients, vendors, or clients"). The evidence showed that Total Play had a substantial relationship with Liberty Games in Virginia, devoting considerable time and financial resources to developing a customer base for Liberty Games there and then managing those customer accounts for and on Liberty Games' behalf, and Total Play had a legitimate business interest in protecting itself from the risk that Galloway would undermine that relationship by appropriating the accounts for himself. See *Kennedy v. Shave Barber Co.*, 348 Ga. App. 298, 305(1)(c) (822 SE2d 606) (2018) (concluding that employer

had legitimate business interest in protecting itself from risk that employee would appropriate customer base "by taking advantage of the contacts developed while she worked [there]"). Moreover, the Employment Agreement reflected that Total Play made a significant financial investment in Galloway to incentivize him to develop and manage routes in Virginia and other states, and Total Play had a legitimate business interest in protecting that investment. See *Global Payments Inc. v. Green*, 484 F.Supp3d 1372, 1380 (M.D. Ga. 2020) (applying GRCA and concluding that employer had legitimate business interest in "protecting its investment" in its employee who occupied "a high-level strategic and leadership role").

In sum, the evidence, viewed in the light most favorable to the judgment, showed both that Total Play did business in Virginia and had legitimate business interests to protect there, and that Galloway was employed by and carried out significant job duties for Total Play in that state. Under these circumstances, the trial court was entitled to conclude that including Virginia within the geographic scope of the non-compete covenants was reasonable. See OCGA § 13-8-56(2); *W. R. Grace & Co.*, 262 Ga. at 466; *Kennedy*, 348 Ga. App. at 305(1)(c); *Chaichimansour*, 226 Ga. App. at 71(1); *Global Payments Inc.*, 484 F.Supp3d at 1380.

In arguing otherwise, Galloway asserts that an employer does not do business in a geographic territory within the meaning of OCGA § 13-8-56(2) where it only performs activities for another company. In support of his assertion, Galloway relies on OCGA § 13-8-53(a)(2), which permits the enforcement of non-compete covenants against former employees who "[c]ustomarily and regularly engage[d] in making sales or obtaining orders or contracts for products or services to be performed by others." According to Galloway, the absence of similar language in OCGA § 13-8-56(2) reflects that the General Assembly did not intend to extend presumptively reasonable geographic limitations to areas where employers only perform activities for others. To reach this conclusion, Galloway maintains that we should apply two basic "tenets of statutory construction: *expressio unius est exclusio alterius* (expression of one thing implies exclusion of another) and *expressum facit cessare tacitum* (if some things are expressly mentioned, the inference is stronger that those not mentioned were intended to be excluded)." *City of Douglasville v. Boyd*, 356 Ga. App. 274, 279 (844 SE2d 846) (2020) (citation modified) (on motion for reconsideration).

Putting aside whether Total Play did nothing more than perform activities for Liberty Games in Virginia, we conclude that Galloway's reliance on OCGA §

18

13-8-53(a)(2) to restrict the meaning of OCGA § 13-8-56(2) is misplaced. The tenets of statutory construction invoked by Galloway "must be applied with great caution, since [their] application depends so much on context." *Boyd*, 356 Ga. App. at 279 (quotation marks omitted). OCGA § 13-8-53(a)(1)-(4) address the specific categories of employees against whom a restrictive covenant can be enforced, but that is a separate and distinct GRCA requirement from whether a covenant is reasonable in geographic area, as addressed by provisions such as OCGA § 13-8-56(2). See *Kennedy*, 348 Ga. App. at 302(1)(a) (distinguishing between the reasonableness requirement and the employee requirement of the GRCA). Given this distinction, we decline to read OCGA § 13-8-53(a)(1)-(4) as bearing on or limiting the meaning of OCGA § 13-8-56(2) in the manner proposed by Galloway. See *Boyd*, 356 Ga. App. at 279. Accordingly, we discern no error in the trial court's ruling that the geographic scope of the non-compete covenants in the Release and Employment agreement was reasonable.[2]

---

[2] Galloway alternatively argues that the Employment Agreement's non-compete covenant, which prohibited him from acting "in the territory where [he] [was] working at the time of termination of his employment with [Total Play]," did not apply in Virginia because the video gaming business was suspended there by statute at the time of his termination. However, the evidence, construed in favor of the judgment, reflected that although Galloway did not collect revenues or sign up new

4. In challenging the trial court's directed verdict rulings, Galloway also argues that the trial court misapplied the GRCA in evaluating whether the duration of the non-compete covenant in the Release was reasonable. According to Galloway, the trial court applied the wrong statutory presumption to determine the reasonableness of the time element of the covenant.

As with the geographic scope of a non-compete covenant, the GRCA requires that the covenant be reasonable in its duration to be enforceable. See OCGA § 13-8-53 (a). Because the reasonableness of the time element is evaluated based on the duration of the restraint, courts focus on "how long [the restraint] *actually* lasts." *Mullally v. CU Cap. Market Solutions*, 368 Ga. App. 602, 607(3) (890 SE2d 494) (2023) (footnote omitted). The non-compete covenant of the Release restricted Galloway from engaging in the redemption route business in North Carolina and Virginia for a period of five years from the date of the Release, that is, until April 15, 2024, and Galloway voluntarily terminated his employment with Total Play on August 8, 2021. Hence, the

customers when business in Virginia was suspended, he continued to exercise job duties in the state by serving as the company representative who spoke with clients and addressed their concerns. Consequently, there was evidence to support a determination that Galloway was working in Virginia at the time of his termination and thus that the non-compete covenant in the Employment Agreement applied to that state.

actual duration of the covenant extended two years and eight months beyond Galloway's term of employment.

The GRCA "does not specifically set or limit the duration of restrictive covenants; instead, OCGA § 13-8-57 simply identifies scenarios in which certain restraint periods are deemed presumptively reasonable or unreasonable." *Mullally*, 368 Ga. App. at 606(3). More specifically, where, as here, a non-compete covenant limits or restricts competition after employment ends, the GRCA supplies certain "rebuttable presumptions" for courts to apply in "determining the reasonableness in time of [the] restrictive covenant sought to be enforced after [the] term of employment." OCGA § 13-8-57(a). See OCGA § 13-8-56(1). Two rebuttable presumptions are at issue in the present case.

The first presumption, which Galloway argues that the trial court should have applied, is set out in OCGA § 13-8-57(b). That subsection applies

> [i]n the case of a restrictive covenant sought to be enforced against a former employee and not associated with the sale or ownership of all or a material part of:
>    (1) The assets of a business, professional practice, or other commercial enterprise;
>    (2) The shares of a corporation;

(3) A partnership interest;

(4) A limited liability company membership; or

(5) An equity interest or profit participation, of any other type, in a business, professional practice, or other commercial enterprise[.]

If subsection (b) applies, a court must "presume to be reasonable in time any restraint two years or less in duration and . . . presume to be unreasonable in time any restraint more than two years in duration, measured from the date of the termination of the business relationship." Id.

The second presumption, which the trial court applied, is set out in OCGA § 13-8-57(d). That subsection applies

[i]n the case of a restrictive covenant sought to be enforced against the owner or seller of all or a material part of:

(1) The assets of a business, professional practice, or other commercial enterprise;

(2) The shares of a corporation;

(3) A partnership interest;

(4) A limited liability company membership; or

(5) An equity interest or profit participation, of any other type, in a business, professional practice, or other commercial enterprise[.]

If subsection (d) applies, courts must "presume to be reasonable in time any restraint . . . five years or less in duration . . . and . . . presume to be unreasonable in time any

restraint more than . . . five years in duration . . . , measured from the date of termination or disposition of such interest." Id.

Because the duration of the non-compete covenant in the Release extended two years and eight months beyond Galloway's term of employment, the time element is presumptively unreasonable if OCGA § 13-8-57(b) applies, but presumptively reasonable if OCGA § 13-8-57(d) applies. Here, the parties' dispute centered on whether the non-compete covenant in the Release fell within OCGA § 13-8-57(d)(5), which applies to a restrictive covenant sought to be enforced against the owner or seller of "all or a material part of [a]n equity interest or profit participation, of any other type, in a business."

In the court below, Total Play argued that the duration of the non-compete covenant in the Release was presumptively reasonable under OCGA § 13-8-57(d)(5) because the covenant was not entered into as part of an employment agreement, but rather in connection with the resolution of Galloway's right to receive periodic "extraordinary payments" that were owed to him by Macke and Total Play. Total Play asserted that the $250,000 payment to Macke to resolve his claim to "extraordinary payments" fell within the category of a "a payment to a party for his

part of the profit participation in a business, which is subject to the lowest level of scrutiny and for which a five year during is presumptively reasonable" under OCGA § 13-8-57(d)(5). The trial court agreed with Total Play and ruled that the duration of the non-compete covenant was presumptively reasonable pursuant to that subsection.

Construing the evidence in the light most favorable to the judgment, we discern no error by the trial court. The record reflects that the Release was entered into separately from the Employment Agreement and included a $250,000 payment to Galloway in exchange for his relinquishment of his right to receive periodic "extraordinary payments" from Total Play. And while the Release did not define the term "extraordinary payments," there was some testimony at trial that Macke promised Galloway a "share in the cash flow profits as the business grew" and that the $250,000 payment under the Release was in exchange for Galloway's right to such a share.[3] Consequently, there was some evidence that the Release included a payment to Galloway for his right to profit participation in Total Play and that the non-compete

---

[3] See generally *McKinley v. Coliseum Health Grp.*, 308 Ga. App. 768, 770(1) (708 SE2d 682) (2011) (concluding that parol evidence was admissible to explain undefined terms in a contract that "were ambiguous and required explanation"); *Ray M. Wright, Inc. v. Stinchcomb*, 259 Ga. App. 212, 214 (576 SE2d 566) (2002) (explaining that parol evidence was admissible to explain the meaning of an undefined contractual term).

covenant thus was entered into in connection with the ownership and sale of a "profit participation . . . in a business." OCGA § 13-8-57(d)(5).[4] Accordingly, we conclude that the non-compete covenant fell within the ambit of subsection (d)(5) such that its duration was presumptively reasonable, as the trial court properly concluded.

In summary, for all of the reasons discussed in Divisions 3 and 4, Galloway has failed to show a basis for disturbing the trial court's directed verdict rulings on Total Play's claims for breach of the non-compete covenants in the Release and Employment Agreement.

5. Lastly, Galloway contends that the trial court erred in denying his motion for a directed verdict on Total Play's claim for attorney fees and expenses under OCGA

---

[4] Galloway argues that he did not meet the definition of a "seller" under the GRCA and that OCGA § 13-8-57(d)(5) thus was inapplicable to him. But the GRCA defines a "seller" to include any person who is "[a]n executive employee of the business who receives, at a minimum, consideration in connection with a sale." OCGA § 13-8-51(17)(B). And "executive employee" is defined as "a member of the board of directors, an officer, a key employee, a manager, or a supervisor of an employer." OCGA § 13-8-51(7). There was evidence that Galloway was an "executive employee" of Total Play because he was a manager and a "key employee." See OCGA § 13-8-51(8) (defining "key employee" to include "an employee in possession of selective or specialized skills, learning, or abilities or customer contacts or customer information who has obtained such skills, learning, abilities, contacts, or information by reason of having worked for the employer."). And, as noted above, there was evidence that Galloway received "consideration" — i.e., the $250,000 — in exchange for his right to a profit participation in Total Play.

§ 13-6-11 and for entering judgment on the jury verdict on that claim. According to Galloway, there was insufficient evidence that he acted with bad faith, was stubbornly litigious, or caused unnecessary trouble and expense, and Total Play failed to carry its burden of segregating out the hours expended by its counsel that were recoverable from those that were not recoverable.[5]

(a) "Attorney fees are recoverable under OCGA § 13-6-11 when a party has acted in bad faith, has been stubbornly litigious, or has subjected the other party to unnecessary trouble and expense." *Health Servs. of Cent. Ga. v. Wanna*, 373 Ga. App. 642, 657(4) (908 SE2d 41) (2024) (quotation marks omitted). The question whether to award fees under OCGA § 13-6-11 is for the jury to resolve, and an award of fees will be upheld on appeal if there is any evidence to support it. Id. Although Galloway argues otherwise, we conclude that there was evidence to support an award of attorney fees based on bad faith.[6]

---

[5] Contrary to Galloway's argument, OCGA § 13-6-11 allows for an award of attorney fees even when nominal damages are recovered on the underlying substantive claims. See *Tyler v. Lincoln*, 272 Ga. 118, 121(2) (527 SE2d 180) (2000); *Savannah College of Art & Design v. Nulph,* 265 Ga. 662, 663(4) (460 SE2d 792) (1995).

[6] Because we find that there was evidence of bad faith, we need not address whether there was evidence of stubborn litigiousness or of Galloway causing unnecessary trouble and expense. See *ISS Int'l Serv. Sys. v. Widmer*, 264 Ga. App. 55,

Bad faith warranting an award of attorney fees must have arisen out of the transaction on which the cause of action is predicated. Moreover, we have noted that there may be bad faith in carrying out the provisions of the contract sufficient to support the award. Finally, despite the existence of a bona fide controversy as to liability, a factfinder may find that defendant acted in the most atrocious bad faith in his dealing with the plaintiff. And bad faith may be found in a defendant's conduct if it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive.

*Wilson v. Clark Atlanta Univ.*, 339 Ga. App. 814, 835(3) (794 SE2d 422) (2016) (quotation marks omitted).

There was some evidence, including Galloway's own admissions, that Galloway was fully aware of the restrictive covenants in the Release and Employment Agreement and received two letters from Total Play after his termination reminding him of the same, but that he nevertheless intentionally chose to violate the covenants out of anger at Macke for costing him his job with a competitor and because he believed that the redemption routes in Virginia should belong to him. Based on this evidence, the jury was entitled to find that Galloway acted in bad faith in the underlying transaction so as to support an award of attorney fees under OCGA § 13-6-62-63(4) (589 SE2d 820) (2003).

11. See *Wilson*, 339 Ga. App. at 835(3). See also *Widmer*, 264 Ga. App. at 63(4) (concluding that the evidence supported an award of attorney fees based on bad faith, where there was evidence that the defendant "chose to ignore the agreement rather than have to pay any more money"); *Parks v. Breedlove*, 241 Ga. App. 72, 74(1) (526 SE2d 137) (1999) (determining that jury was justified in awarding attorney fees for bad faith, where there was evidence that the defendants failed to carry out their contractual obligations out of financial interest rather than an "honest belief" that they did not have to perform).

(b) Galloway also argues that the trial court erred by entering judgment on the $126,220.53 fees award because Total Play did not segregate out the hours of its counsel that were recoverable from those that were unrecoverable.

"In order to support the jury's verdict of attorney fees under OCGA § 13-6-11, there must be some evidence presented to it to show what constituted reasonable fees of litigation. And, where a plaintiff is awarded attorney fees under OCGA § 13-6-11, such an award must be apportioned to those attorney fees attributable to claims on which the plaintiff prevailed." *Wilson v. Wernowsky*, 355 Ga. App. 834, 847(4) (846 SE2d 101) (2020) (citation omitted). There is an exception to this rule if the plaintiff's

"various claims are so similar that it would be too difficult to separate the hours spent on each, [in which case] the party entitled to fees is not required to allocate his hours." *Eagle Jets v. Atlanta Jet*, 347 Ga. App. 567, 574–75(2)(b) (820 SE2d 197) (2018) (citation modified). Put another way, "fee separation is not required if the evidence shows that the claims were so 'intertwined' that work performed in connection with other claims was necessary as well for the claim on which fees were allowed." Id. (quotation marks omitted).

Total Play "had the burden of proof on the issue of attorney fees, and [it] was required to segregate out the hours that were recoverable from those hours that were unrecoverable," given that Total Play did not prevail on all of its claims. *Health Servs. of Cent. Ga.*, 373 Ga. App. at 658(4). And to the extent that Total Play believed that the exception to the rule of apportionment applied, it had the "burden of proving that the claims were too intertwined to permit the separation of fees" and could not rely on "generalized assertions of connectedness." *Eagle Jets*, 347 Ga. App. at 577(2)(c).

Total Play failed to carry its burden here. At trial, Total Play "merely proved the 'lump sum' amount of attorney fees and expenses of litigation incurred in working on the entire case" without asserting or attempting to show that its claims were

29

intertwined. *Premier Cabinets v. Bulat*, 261 Ga. App. 578, 582(5) (583 SE2d 235) (2003). While Total Play introduced into evidence the invoices of its counsel reflecting different tasks that were performed during the course of the litigation,

> they were not of sufficient particularity to permit the factfinder to distinguish between time and expenses attributable to the successful claims and time and expenses attributable to the pursuit of the unsuccessful claims[.] . . . . Therefore, under the state of the evidence in the present case, the factfinder would have been forced into a posture of pure speculation as to which fees were attributable solely to prosecuting the successful claims.

*Health Servs. of Cent. Ga.*, 373 Ga. App. at 659(4) (citation modified). Under these circumstances, "[t]he award of attorney fees in this case is contrary to the law and simply cannot be upheld as authorized pursuant to OCGA § 13-6-11." *Birch Prop. Partners v. Simpson*, 364 Ga. App. 315, 330(6)(c) (874 SE2d 814) (2022) (quotation marks omitted).[7] We therefore reverse the judgment entered on the attorney fees

---

[7] Total Play argues that Galloway waived the fees apportionment issue by failing to raise it in the court below, including in his motions for a directed verdict in which he challenged Total Play's entitlement to attorney fees. But segregating the hours that were recoverable from those that were not, or showing that the claims were interwoven, was part of Total Play's evidentiary burden and thus went to the sufficiency of the evidence, which can be challenged even in the absence of argument made in the trial court. See *Shaw v. Smith*, 374 Ga. App. 623, 628(3)(c) n.3 (913 SE2d

award and remand the case to the trial court for an evidentiary hearing to allow Total Play to establish what portion of the awarded fees was attributable solely to its prevailing claims or that the claims were so interwoven that segregation of fees was not possible. See *Premier Cabinets*, 261 Ga. App. at 583(5); *David C. Joel, Att'y at L., P.C. v. Chastain*, 254 Ga. App. 592, 592, 597(4) (562 SE2d 746) (2002).

*Judgment affirmed in part and reversed in part, and case remanded with direction.*

*Markle and Hodges, JJ., concur.*

---

750) (2025) (explaining that "[b]ecause [the appellant] moved for a directed verdict on [the appellee's] negligence claim, she is free to challenge the sufficiency of the evidence as to that claim, even if she did not raise in the court below the specific arguments set forth on appeal" (citation modified)); *Spirnak v. Meadows*, 355 Ga. App. 857, 870(7) (844 SE2d 482) (2020) ("Where the party obtains the judgment without meeting the burden of proof, the opposing party may challenge the judgment on that ground, and in doing so may assert arguments not made to the trial court." (citation modified)). Consequently, Galloway did not waive his claim of error regarding the allocation of attorney fees. See *Birch Prop. Partners*, 364 Ga. App. at 330(6)(c) (finding that appellant did not waive its argument that attorney fees should have been allocated between successful and unsuccessful claims by failing to raise the issue in the court below); *Premier Cabinets*, 261 Ga. App. at 582–83(5) (same). Compare *Davis v. Whitford Props.*, 282 Ga. App. 143, 147(2) (637 SE2d 849) (2006) (concluding that appellants could not raise the fees allocation issue for the first time on appeal because they induced the error, given that "the parties agreed that each side would submit their litigation expense bills to the jury without testifying or cross-examination," both sides "tendered their litigation expenses into evidence[ ] without any itemization," and the appellants "consented to the method of presenting litigation expenses to the jury and made no objections to such presentation when they had the opportunity to do so").